United States District Court
Middle District of Florida
Jacksonville Division

UNITED STATES OF AMERICA,

        *Plaintiff,*

v.                                          No. 3:14-cr-21-J-32PDB

MICHAEL HOLMES,

        *Defendant.*

_____

## Report & Recommendation on Motion to Suppress

Michael Holmes is charged with one gun and two drug crimes. Doc. 17. He moves to suppress all evidence of the drugs and guns, as well as some incriminating statements. Docs. 24, 26, 29. I conducted an evidentiary hearing, Doc. 37, and the parties filed briefs afterward, Docs. 35, 36. The facts are undisputed. The motion presents two primary issues: (1) whether detectives conducted an illegal "knock and talk" at his house in light of a perimeter chain-link fence and "no trespassing," "private property," and "beware of the dog" signs there; and (2) if so, whether the exclusionary rule applies.

## I.    Findings of Fact

The United States presented three witnesses: Jacksonville Sheriff's Office (JSO) Detectives Gary Thompkins and Z.M. Anderson and Bureau of Alcohol, Tobacco, and Firearms (ATF) Special Agent Richard Samples. Tr. 5–157. I found them credible based on their demeanor and consistent, reasonable, and seemingly

unscripted testimony. Holmes did not present any witness. Without objection, I admitted government exhibits 1 through 7 (photographs of Holmes's house and drugs discovered there, taken at that time) and defense exhibits 1 through 4 (photographs of Holmes's house, taken at an unspecified time, and a search warrant and the affidavit that had supported it). The findings of fact are based on the testimony and exhibits.

Last November 8, JSO received a complaint about drug dealing at a house at 6523 Armco Street:



Tr. 11; Def. Ex. 1A. The house is on a quiet street but in an area that "can be quite violent." Tr. 29. Looking at the house from the street, a person would see a large enclosed porch on the left side and, further back, a large boarded-up garage on the right side. Def. Ex. 1A. The bottom of the porch is lattice; the top, mesh screen. Tr. 22, 149; Def. Ex. 1A. The inside of the porch is visible through the screen, with the screen slightly shading its details. Tr. 147, 149–50; Def. Ex. 2C. A concrete driveway

runs from the street to the garage. Def. Ex. 1A. A grassy lawn is in front of the porch and to the right of the driveway. Def. Ex. 1A. Next to that grassy lawn (not shown in the photograph above), is the foundation for another driveway under construction with lumber forms but on which concrete has not yet been poured, along with mounds of lumber and other construction material. Gov't Ex. 3. A small patch of grass (a few feet wide) is between the main, completed driveway and the porch door. Tr. 87−88; Def. Ex. 1A.

A four-foot-high, chain-link fence surrounds the property without obstructing the view of the house or the rest of the property. Tr. 21; Def. Ex. 1A. The main entrance onto the property, whether for car or person, is a large, two-door, swing-open gate—a continuum of the fence—toward the front of the main, completed driveway. Def. Ex. 1A. It has a standard lift-up latch with no lock. Tr. 22. The distance from the street to the gate is about 8 to 10 feet, and from the gate to the porch about half that. Tr. 45; Def. Ex. 1A. A sliding gate—likewise a continuum of the fence—is in front of the driveway construction project. Gov't Ex. 3. On the day in question, the sliding gate was in front of the driveway construction project, Gov't Ex. 3; in the above photograph, taken at an unspecified time, it is pulled to the side, toward the house, Def. Ex. 1A. The mailbox is outside of the fence.[1] Tr. 45. On the main swing-open gate, there is one small (approximately 10 by 14 inches), commercially printed black

---

[1]Without testimony from Holmes or any defense witnesses, the record does not indicate whether he ordinarily put his garbage cans for collection inside or outside of the fence (though the undated photographs that he presents shows them outside of the fence, *see, e.g.* Def. Ex. 1A), whether the utility meter is read inside or outside of the fence, or whether he ordinarily receives visitors through either gate.

and white sign that warns in small (approximately 2 to 3 inch), all-capital lettering, "beware of the dog." Def. Ex. 1A. At least ten feet from that, on the fence to the right of the gate and main, completed driveway, in front of the grassy lawn, there is a similar sign that warns, "no trespassing." Tr. 50−53; Gov't Ex. 3; Def. Ex. 1A. And further to the right of that sign, about fifteen feet from it, on the sliding gate in front of the driveway construction project, there are two more similar signs that warn, "private property[,] no trespassing" and "beware of the dog." Gov't Ex. 3; Def. Ex. 1A.

The JSO gave the complaint its highest priority (one out of five) and assigned it to Detective Thompkins to investigate. Tr. 11, 98–99. He first used confidential informants. Tr. 12, 119–20. On November 24, he and Detective Anderson went undercover and drove to the house with an informant. Tr. 12, 95. They stayed in their car while the informant approached the house. Tr. 13–14. The main gate was closed. Tr. 14, 48. Staying outside of the fence, the informant talked to a man in the driveway about buying drugs. Tr. 48, 86, 97. The man refused to talk to her about drugs, and so she left empty-handed. Tr. 12, 48, 97, 126. Detective Thompkins followed up by researching who paid the electricity bills for the house and who owned a pick-up truck parked there. Tr. 16. Holmes did. Tr. 16.

Detectives Thompkins and Anderson tried again on December 3, returning to the house with another confidential informant. Tr. 16, 99. They again stayed in their car while the informant approached the house. Tr. 16. That time, the main gate was open. Tr. 17. He went through it, walked to and opened the porch door, walked through the porch, and knocked on the front door. Tr. 17, 86. The door does not have

a knocker or bell and is protected by burglar bars. Tr. 19, Def. Ex 2C. A wall lantern hangs beside it. Def. Ex. 2C.



Tr. 19, 27; Def. Ex. 2C. A man opened the door. Tr. 17. Upon the informant's mention of drugs, the man became "leery," and so that informant left empty-handed too. Tr. 17, 58, 128.

Detective Thompkins switched investigative methods. Tr. 18. On December 19, he and Detective Anderson, along with several other detectives and a sergeant, all in tactical clothes, returned to the house to try a "knock and talk." Tr. 17–18, 129–30. Noticing the "beware of the dog" sign on the main gate, Detective Thompkins rattled the gate. Tr. 19. He could not recall if it had been open. Tr. 18. A dog in the yard did

not react.[2] Tr. 101–102. He went through the gate, walked to and opened the porch door, walked through the porch, and knocked on the front door. Tr. 132–33. No one answered, and so they left. Tr. 19, 59, 102, 134.

Detective Thompkins tried again 10 days later. Tr. 19, 102. On December 29, in the afternoon, he and Detective Anderson, along with two other detectives, all in tactical clothes and masks to protect their identities, returned to try another "knock and talk." Tr. 20, 102. A pick-up truck was parallel parked in front of the house, outside of the fence, and partially blocking the completed driveway. Tr. 23, 60–61. The main gate was "partially open." Tr. 25, 60. Reacting to the "beware of the dog" sign on the gate again, Detective Thompkins rattled the gate again, and the dog ignored them again. Tr. 21, 60, 104, 137–38.

Detectives Thompkins and Anderson could only recall having seen the "beware of the dog" sign on the main gate during their visits but did not deny that the others could have been there.[3] Tr. 21, 50, 144. At least on their fourth visit, the direction from which they approached the house and the way the pick-up truck was parked

---

[2]Detective Thompkins could not remember a dog during the first "knock and talk," Tr. 19, but Detective Anderson did, Tr. 101−02. I find that a dog had been in the yard based on Detective Anderson's testimony.

[3]The photographs offered by Holmes and admitted without objection are the only evidence of the two signs on the sliding gate in front of the driveway construction project. *See* Comp. Def. Exs. 1, 2. Holmes did not offer any evidence about when the photographs had been taken, leaving one to wonder whether they had been there during the time at issue. Because the United States does not dispute that they had been there then, Doc. 26 at 7, because they do not appear to be brand new, Def. Ex. 1A, and they have the same appearance as the other signs, Def. Ex. 1A, I find that all four signs had been posted during the four times that the detectives had visited the house.

could have made the other three signs hard for them to see upon their approach to the main gate. Tr. 75−76, 78. From their number of visits (four, Tr. 12, 16, 17, 19), from their presumed training to be aware of their surroundings, from the location of the signs (on the front fence and gates, Def. Ex. 1A), and from Detective Thompkins's testimony concerning the sign they could recall ("I remember being leery of a dog because I saw Beware of Dog sign or something of that nature. I shook the fence." Tr. 19), I infer that the detectives had seen all of the signs during one or more of the visits but had placed significance only on the "beware of the dog" sign (they did not want to get bitten).

Detective Thompkins and another detective went through the main gate, walked up to and opened the porch door, walked through the porch, and knocked on the front door. Tr. 28, 61–63, 89. Detective Thompkins put his mask up so that his face was visible. Tr. 20. The porch was bare except for a few empty planters. Tr. 88−89. To ensure everyone's safety, the other detectives stayed outside of the fence in front of the house. Tr. 103. At least one of them stood near the "no trespassing" sign on the fence. Tr. 37.

Holmes, shirtless, opened the door and said hello. Tr. 30–31, 67. Detective Thompkins introduced himself and asked if Holmes would mind stepping outside to speak to him for a second. Tr. 31. He stepped outside. Tr. 31. Detective Thompkins asked his name, if he owned the house, and if he had identification. Tr. 31. He identified himself and said that it was inside. Tr. 31. Detective Thompkins asked if he would get it. Tr. 31. He said yes and went back inside, closing the burglar-bar door

behind him but leaving the front door open. Tr. 32, 64. The detectives had but did not draw guns. Tr. 34, 66. The tone of the conversation was "very calm." Tr. 33.

Holmes took longer than what seemed appropriate to Detective Thompkins. Tr. 32. Upon hearing a suspicious sound that he thought might be Holmes destroying evidence, he stepped closer to the front door. Tr. 32, 64−65, 69−70, 79. There, he smelled freshly burnt marijuana wafting from inside. Tr. 32, 64−65, 70. He thought that he had smelled it before, when he had been talking to Holmes, but the smell was stronger closer to the front door. Tr. 71. The other detective confirmed the scent and radioed the new development to Detective Anderson, who then joined them on the porch. Tr. 35, 140, 115.

When Holmes returned with his identification, Detective Thompkins told him about the complaint of drug-dealing there and asked him if he used drugs, like marijuana. Tr. 33–34. He responded, "'Yeah, I smoke marijuana.'" Tr. 34. Detective Thompkins said they could smell it and asked if he had any inside. Tr. 34. He said no. Tr. 34. Detective Thompkins asked if they could search the house. Tr. 34. He said no again. Tr. 34, 65. Deciding to get a search warrant, Detective Anderson handcuffed him and moved him to the tailgate of the pick-up truck. Tr. 34–36. He impulsively said that he had "had a good run" and was "not going to see the streets anymore." Tr. 35. He remained calm and never told any of the detectives to get off of his property. Tr. 33−34, 111−12, 140−141.

While Detective Thompkins was drafting a warrant affidavit, Holmes asked if he could go inside to get a shirt. Tr. 36–37, 112. The detectives told him that they

8

would have to escort him. Tr. 37, 112. While he led Detective Anderson and another detective to his bedroom, Detective Anderson saw marijuana in a bag on a desk in his living room and marijuana cigarettes on a dresser in his bedroom. Tr. 37, 114–115, 117. Detective Thompkins added those discoveries to the affidavit. Tr. 37.

Detective Thompkins obtained a warrant to search the house for drugs, drug paraphernalia, and cash. Tr. 36, 119; Def. Ex. 4. After he returned, he advised Holmes of his *Miranda* rights. Tr. 38. In a safe in a bedroom and elsewhere, the detectives found a dozen guns, ammunition, a bulletproof vest, a tactical vest, $3600, pills, marijuana, and cocaine. Tr. 39. Holmes told one of them that he had thought about having a shootout with them when he had gone inside to get his identification but had changed his mind because he had nowhere to run and did not want to die that day. Tr. 40. If it had been another day or he had been in another state of mind, he explained, he might have acted on his thought. Tr. 40.

Agent Samples went to the scene. Tr. 42, 152–153. Holmes admitted that he owned the guns and said that he had bought them with cash. Tr. 154–55. Agent Samples offered him a chance to cooperate with ATF, but he declined, explaining, "I sell dope. People come, I buy." Tr. 154.

## II.    Conclusions of Law

### A.    *The detectives did not violate the Fourth Amendment.*

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." At its "core stands the right of a man to retreat into

his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). A warrantless search of a home (as well as its curtilage, which includes a front porch, *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013)) therefore is presumptively unreasonable, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). But there are a few exceptions that serve to overcome the presumption, with reasonableness as the "ultimate touchstone." *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014). If history does not answer the reasonableness question, courts assess it by balancing the degree to which the search or seizure intrudes upon one's privacy against "the degree to which it is needed for the promotion of legitimate governmental interests." *Virginia v. Moore*, 553 U.S. 164, 171 (2008).

There are two "distinct views" of the interests that the Fourth Amendment protects: a property view (the traditional and recently revived view) and a privacy view (the later-developed view). *United States v. Davis*, 754 F.3d 1205, 1212 (11th Cir. 2014). As a result, there are two distinct tests for assessing whether a violation occurred: the trespassory test and the reasonable-expectations test, *United States v. Jones*, 132 S. Ct. 945, 952 (2012).

Under the trespassory test, a search occurs if there is a common-law trespass (willful entry or remaining on property without authority, license, or invitation) upon an area that the Fourth Amendment protects (upon a person, house, paper, or effect) together with an attempt to find something or gain information there.[4] *Jones*, 132 S.

---

[4]Blackstone defined trespass as "an entry on another man's ground without a lawful authority, and doing some damage, however inconsiderable, to his real property." 3 William Blackstone, Commentaries *209. Damage was essentially

Ct. at 951 n.5. The Supreme Court recently applied the test in *Jones* to hold that officers may not attach tracking devices to cars because doing so constitutes a common-law trespass upon an effect to gather information, *id.* at 951, and then in *Jardines* to hold that officers may not enter curtilage with drug-sniffing dogs because doing so constitutes a common-law trespass upon a home to gather information, 133 S. Ct. at 1416.

Based on Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 360 (1967), the reasonable-expectations test is also known as the *Katz* test. Under the test, a search occurs if there is an invasion of privacy together with an attempt to find something or gain information. *Jones*, 132 S. Ct. at 951 n.5. The test involves a "two-part inquiry: first, has the individual manifested a subjective expectation of privacy

---

presumed: "[E]very such entry or breach of a man's close carries necessarily along with it some damage or other: for, if no other special loss can be assigned, yet still the words of the writ itself specify one general damage, *viz.* the treading down and bruising his herbage." *Id.* at *210; *see also Jones*, 132 S. Ct. at 958 ("At common law, any unauthorized intrusion on private property was actionable.") (Alito, J., concurring) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on Law of Torts 75 (5th ed. 1984)); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1262−63 (11th Cir. 2012) (discussing common-law trespass). Trespass under Florida law is akin to trespass under common law. Florida criminalizes trespass (willful entry or remaining on property without authority, license, or invitation) upon unenclosed curtilage if done with the intent to commit a crime other than trespass, Fla. Stat. § 810.09(1)(a)(2), or upon any property "[a]s to which notice against entering or remaining is given, either by actual communication to the offender or by [conspicuous] posting, fencing, or cultivation," *id.* (1)(a)(1) (incorporating Fla. Stat. § 810.011(5)). "Conspicuous" posting is notice on trees or posts with "no trespassing" painted in international orange color and with letters no less than 2 inches high and 1 inch wide, placed between 3 and 5 feet from the ground, and in places "that are readily visible to any person approaching the property and no more than 500 feet apart on agricultural land" and "where entry to the property is normally expected or known to occur." Fla. Stat. § 810.011(5)(a) & (b).

in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986). The Supreme Court has applied the test to hold, for example, that officers without warrants may use dogs to inspect cars during lawful traffic stops, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); search garbage left for collection outside of curtilage, *California v. Greenwood*, 486 U.S. 35, 37 (1988); aerially observe fenced-in backyards, *Ciraolo*, 476 U.S. at 213−14; search open fields, *Oliver v. United States*, 466 U.S. 170, 182−83 (1984); chemically test substances that fall from parcels in transit, *United States v. Jacobsen*, 466 U.S. 109, 119 (1984); use dogs to inspect airport luggage, *United States v. Place*, 462 U.S. 696, 707 (1983); and use devices placed with consent in containers to track public movements, *United States v. Knotts*, 460 U.S. 276, 281−82 (1983); but may not use sense-enhancing technology to gather information about the insides of homes, *Kyllo v. United States*, 533 U.S. 27, 40 (2001); handle bus passengers' baggage, *Bond v. United States*, 529 U.S. 334, 338–39 (2000); monitor devices placed with consent in containers to gather non-public information inside homes, *United States v. Karo*, 468 U.S. 705, 717 (1984); or attach eavesdropping devices to telephone booths, *Katz*, 389 U.S. at 351.

The Court's application of the trespassory test in *Jardines* and *Jones* marked a seeming shift from the Court's previous primary application of the reasonable-expectations test since *Katz*. In both *Jardines* and *Jones*, the Court emphasized that the reasonable-expectations test was added to—not substituted for—the trespassory test and that a court does not need to apply the reasonable-expectations test if it

concludes under the trespassory test that a Fourth Amendment violation had occurred. *Jardines*, 133 S. Ct. at 1417; *Jones*, 132 S. Ct. at 952. Thus, in both cases, the Court started and stopped with the trespassory test, *Jardines*, 133 S. Ct. at 1417; *Jones*, 132 S. Ct. at 952, with a concurrence in *Jardines* observing that, in cases involving searches of homes, the tests inevitably align because the "law of property naturally enough influences our shared social expectations of what places should be free from governmental incursions," 133 S. Ct. at 1419 (Kagan, J., concurring).

The "knock and talk" is a widely used investigatory tool.[5] *King*, 131 S. Ct. at 1860. During a "knock and talk," an officer approaches a house with or without probable cause and knocks on the door to, for example, question the resident about possible criminal activity there or elsewhere, obtain plain views of the interior, or try to obtain consent to search. *Id.* at 1860. A resident is free to not open the door, to not talk if he does open the door, and to tell the officer to get off of his property. *Id.* at 1862. The oft-cited rationale for sanctioning the "knock and talk" is this:

> Absent express orders from the [resident] against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964).

Both the Eleventh Circuit and the Supreme Court have sanctioned the "knock

---

[5]A history of the "knock and talk," including the first use of the term, is in *United States v. Walters*, 529 F. Supp. 2d 628, 636–37 (E.D. Tex. 2007).

and talk" under that rationale. In *United States v. Taylor*, the Eleventh Circuit said that, "absent express orders from the person in possession," an officer without a warrant may enter private property to knock on the person's door (just as any private citizen may) for "legitimate police purposes unconnected with a search." 458 F.3d 1201, 1204 (11th Cir. 2006). The court did not clarify "express orders" and has not done so since.

The Supreme Court sanctioned the "knock and talk" in *King* when it held that exigent circumstances allow officers to conduct warrantless searches even when they cause the exigencies by knocking and announcing their presence, 131 S. Ct. at 1862, and in *Jardines*, when it held that officers may not enter curtilage with drug-sniffing dogs, 133 S. Ct. at 1415−16. In *Jardines*, the Court explained that because "[a] license may be implied from the habits of the country," it has "recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Id.* at 1415 (internal quotation marks omitted). That implied license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* at 1415–16 (internal quotation marks and footnote omitted). But that implied license is not an

invitation to explore the area; "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 1416. "The question [is] whether the officer's conduct was an objectively reasonable search. … [T]hat depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered." *Id.* at 1416–17. Entering curtilage with a drug-sniffing dog "objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do." *Id.* at 1417.

With focus on the objectively revealed purpose of entering the porch, *Jardines* did not eliminate the plain-view doctrine as it applies to the "knock and talk."[6] *See generally id.* Indeed, in *King*, decided just two years before *Jardines*, the Court, in discussing the doctrine, emphasized that "the Fourth Amendment requires only that the steps preceding the seizure be lawful." 131 S. Ct. at 1858. As the Court had held earlier, if "the initial intrusion that brings the police within plain view [of an object] is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is ... legitimate." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). If an officer is conducting a lawful "knock and talk," he therefore may make plain-view observations and use them to support a warrant application. *United States v. Cha*, 431 F. App'x 790, 797 (11th Cir. 2011); *United States v. Cox*, 391 F. App'x 756, 758 (11th Cir. 2010).

---

[6]Under the plain-view doctrine, an officer may seize an object without a warrant if he is lawfully in the place where the object may be plainly viewed, he has a lawful right of access to the object itself, and the incriminating character of the object is immediately apparent. *United States v. Folk*, 754 F.3d 905, 911 (11th Cir. 2014).

Neither the Supreme Court nor the Eleventh Circuit has addressed the effect of "no trespassing" signs and similar measures on the "knock and talk." Two Supreme Court cases have addressed their effect in other contexts. In *Breard v. City of Alexandria, La.*, a civil case upholding an ordinance prohibiting door-to-door solicitation, the Court observed, "It is true that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers for all kinds of salable articles. When such visitors are barred from premises by notice or order, however, subsequent trespasses have been punished." 341 U.S. 622, 626 (1951); *abrogated on other grounds by Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980). And in *Oliver*, in holding under the reasonable-expectations test that officers may conduct warrantless searches of open fields (which are not persons, houses, papers, or effects and thus not protected by the Fourth Amendment), the Court observed that neither signs nor fencing usually bar the public from viewing open fields and, although serving to keep the public out, neither speaks to the legitimacy of any expectation of privacy. 466 U.S. at 182–83. The test, the Court explained, is not whether a property owner chooses to conceal activity but whether the government intrusion "infringes upon the personal and societal values" that the Fourth Amendment protects. *Id.* The Court rejected the owners' argument that "the circumstances of a search sometimes may indicate that reasonable expectations of privacy were violated … and that courts therefore should analyze [the] circumstances on a case-by-case basis." *Id.* at 181. The Court explained that a case-by-case approach would not "provide a workable accommodation between

the needs of law enforcement and the interests protected by the Fourth Amendment." *Id.* "Under th[at] approach, police officers would have to guess before every search whether landowners had erected fences sufficiently high, posted a sufficient number of warning signs, or located contraband in an area sufficiently secluded to establish a right of privacy." *Id.* "The lawfulness of a search would turn on a highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions." *Id.* (internal quotation marks and alterations omitted). That "ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority, it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced. *Id.* at 181−82 (internal citations omitted).

With no analysis or one that generally applies all or part of the reasonable-expectations test, other courts have had mixed opinions on the effect of "no trespassing" signs and similar measures on the "knock and talk." A few have held that signs alone serve to revoke the implied license. *See State v. Blackwell*, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010) (unpublished); *State v. Roubique*, 421 So. 2d 859, 862 (La. 1982).[7] Others have held

---

[7]Other courts, in dictum, have stated or implied that signs would have served to revoke the implied license. *Green v. United States*, No. 13-0004-WS-C, 2014 WL 977630, at *8 n.21 (S.D. Ala. Mar. 14, 2014) (unpublished); *United States v. Byle*, No. 8:10-cr-419-T-30TGW, 2011 WL 1983359, at *10–13 (M.D. Fla. Apr. 15, 2011) (unpublished); *United States v. Clay*, No. 4:10-cr-31, 2011 WL 2224606, at *4–5 (E.D. Tenn. Apr. 11, 2011) (unpublished); *Powell v. State*, 120 So. 3d 577, 584–85 (Fla. 1st DCA 2013); *Commonwealth v. Ousley*, 393 S.W.3d 15, 29 (Ky. 2013); *Nieminski v. State*, 60 So. 3d 521, 526, 529 (Fla. 2d DCA 2011); *State v. Henry*, No. W2005-02890-CCA-R3-CD, 2007 WL 1094146, at *5 (Tenn. Crim. App. Apr. 11, 2007) (unpublished);

the opposite. *See United States v. Hopper*, 58 F. App'x 619, 623–24 (6th Cir. 2003); *United States v. Jones*, No. 4:13-cr-11-003, 2013 WL 4678229, at *6–7, 9 (W.D. Va. Aug. 30, 2013) (unpublished); *United States v. Schultz*, No. 13-20023, 2013 WL 2352742, at *1, 5 (E.D. Mich. May 29, 2013) (unpublished); *United States v. Walters*, 529 F. Supp. 2d 628, 640–41 (E.D. Tex. 2007); *State v. Morgan*, No. 13-CA-30, 2014 WL 1836015, at *2, 4 (Ohio Ct. App. May 1, 2014) (unpublished); *Jones v. State*, 943 A.2d 1, 9–13 (Md. Ct. Spec. App. 2008); *State v. Friedli*, No. 50191-7-I, 2003 WL 22173063, at *2–3 (Wash. Ct. App. Sept. 22, 2003) (unpublished); *State v. Hornback*, 871 P.2d 1075, 1078 & n.4 (Wash. Ct. App. 1994); *Wysong v. State*, 614 So. 2d 670, 671 (Fla. 4th DCA 1993).

Other courts have taken a case-by-case approach. In the following cases, courts have held that "no trespassing" and similar signs together with various other measures served to revoke the implied license: *Edens v. Kennedy*, 112 F. App'x 870, 872–73, 875 (4th Cir. 2004) (rail fence that did not obscure view of house, locked gate, "no trespassing" sign on fencepost next to gate, several other "no trespassing" signs on property); *United States v. Rodriguez*, No. 1:08-cr-32-SPM, 2009 WL 762203, at *2, 7–8 (N.D. Fla. Mar. 18, 2009) (unpublished) (five-foot-high wire fence, five-foot-high cattle gate covered with wire fencing and secured with pin, "beware of dogs" sign on gate, "no trespassing" sign on fence); *United States v. Hambelton*, No. 1:08-cr-26-

---

*Robinson v. Commonwealth*, 625 S.E.2d 651, 657–58 (Va. Ct. App. 2006); *People v. Pemberton*, No. 238522, 2003 WL 1795551, at *2 (Mich. Ct. App. April 3, 2003) (unpublished); *State v. Edwards*, 36 S.W.3d 22, 28 (Mo. Ct. App. 2000); *State v. McIntyre*, 860 P.2d 299, 301–02 (Or. Ct. App. 1993); *People v. Mendoza*, 122 Cal. App. 3d Supp. 12, 14–15 (1981).

SPM, 2009 WL 722284, at *1–2, 4 (N.D. Fla. Mar. 18, 2009) (unpublished) (perimeter four-foot-high wire fence, five-to-six-foot-high chain-link gate locked with two padlocks, two "guard dogs" signs on gate); *Madruga v. Cnty. of Riverside*, 431 F. Supp. 2d 1049, 1053, 1057, 1059–60 (C.D. Cal. 2005) (five-foot-four-inch-high solid cinderblock wall, two closed five-foot-four-inch-high wooden gates (driveway gate and foot-traffic gate) ordinarily kept locked, foot-traffic gate equipped with deadbolt and bell to signal someone's presence, "warning, guard dogs" sign on driveway gate next to foot-traffic gate, meter read from outside, mailbox off property, no sidewalk in front); *Bainter v. State*, 135 So. 3d 517, 518–20 (Fla. 5th DCA 2014) (barbed-wire perimeter fence, six-foot-high open chain-link gate, several "no trespassing" signs at driveway entrance, mailbox outside fence).[8]

In contrast, in the following cases, courts have held that "no trespassing" and similar signs together with various other measures did not serve to revoke the implied license: *United States v. Denim*, No. 2:13-CR-63, 2013 WL 4591469, at *2–6 (E.D. Tenn. Aug. 28, 2013) (unpublished) (house not visible from road, open gate across driveway, six "no trespassing" signs along length of driveway, meter read

---

[8]*See also State v. Roper*, 294 P.3d 517, 518 (Or. Ct. App. 2012) (Oregon Constitution with provision similar to Fourth Amendment; four-to-five-foot-high perimeter fence, open gate across driveway, "posted, no trespassing, keep out" sign on gate, and two "no trespassing" signs on fence near gate); *State v. Christensen*, 953 P.2d 583, 587–88 (Idaho 1998) (Idaho constitution with provision similar to Fourth Amendment; perimeter shrubbery, closed, unlocked gate, "no trespassing" sign on gate); *State v. Poulos*, 942 P.2d 901, 903–04 (Or. Ct. App. 1997) (Oregon Constitution; remote location, mailbox and newspaper box on highway at base of driveway, "no trespassing," "no hunting," "keep out," "guard dog," and "stop" signs along unpaved driveway leading to residence).

remotely, mailbox at end of driveway); *United States v. Lowry*, No. 1:06-cr-00038-MP-AK, 2007 WL 1655419, at *1–2 (N.D. Fla. June 6, 2007) (unpublished) (perimeter fence down in places because of fallen trees, thick bushes along fence, "no trespassing" signs on fence, meter read remotely, open gate usually kept closed, receptacle at gate for deliveries), *aff'd* 315 F. App'x 214 (11th Cir. 2008); *Allender v. Huesman*, No. IP01-1718-C-T/K, 2003 WL 23142184, at *4–6 (S.D. Ind. Apr. 14, 2003) (unpublished) (wooden rail and wire fence that did not obstruct view of home, no closed or locked gate, two "private property, no trespassing" signs at end of driveway); *People v. Brennan*, No. E045867, 2009 WL 497702, at *1–3 (Cal. Ct. App. 4th Dist. Feb. 26, 2009) (unpublished) (perimeter chain-link fence, unlocked gate, "no trespassing" sign on gate); *accord United States v. Moffitt*, 233 F. App'x 409, 411–12 (5th Cir. 2007) (in holding that driveway used by confidential informant was not protected curtilage, stating that, even with four "no trespassing" signs on chain-link fence, with "an open gate in an urban neighborhood, [defendant] could not have reasonably expected to keep neighbors, door-to-door salespeople, and trick or treaters from driving or walking to his house and approaching this front door.").[9]

The following principles can be gleaned from the above jurisprudence. The reasonable-expectations test was added to—not substituted for—the trespassory test. *Jardines*, 133 S. Ct. at 1417; *Jones*, 132 S. Ct. at 952. A "knock and talk" is not a

---

[9]*See also State v. Gabbard*, 877 P.2d 1217, 1219–21 (Or. Ct. App. 1994) (Oregon Constitution; no gate blocking driveway, fence alongside driveway marking boundary between neighbors, "no trespassing" sign on fence, "beware of dog" and "keep out" signs near beginning of driveway).

common-law trespass (willful entry or remaining on property without authority, license, or invitation) because the country's habits imply a license for anyone to knock on the front door to ask questions. *Jardines*, 133 S. Ct. at 1415−16. More intrusive behavior that objectively reveals a purpose of snooping around is a common-law trespass because the country's habits do not imply a license to do that. *Id.* at 1416. A resident may revoke the implied license but must do so expressly. *Taylor*, 458 F.3d at 1204. Without an implied license, a "knock and talk" is unconstitutional under the trespassory test as a common-law trespass on a place that the Fourth Amendment protects (the curtilage). *See Jardines*, 133 S. Ct. at 1416−17. At least in the context of a search of open fields for which the reasonable-expectations test applies, a categorical approach is preferable to a case-by-case approach that would require officers to assess privacy expectations by trying to weigh the innumerable ways in which property owners try to express ownership or privacy interests. *See Oliver*, 466 U.S. at 181. Some categorical rules apply in the "knock and talk" context: it would not be okay to conduct one at a house with a high perimeter fence and a locked gate, with a solid wall and a closed entry, or with a resident shouting, "stay off my property"; any of those circumstances undeniably serve as an express revocation of the implied license to approach the front door and knock. But circumstances shy of those have led courts to take a case-by-case approach, usually under all or part of the reasonable-expectations test, that considers the many variables that officers confront when conducting a "knock and talk."

Focusing on his strongest argument, Holmes has not pursued weaker ones. He

does not dispute the general validity of a "knock-and-talk." *See generally* Docs. 24, 24-1, 29, 35. He does not dispute that the detectives' purpose at the outset was to conduct a "knock and talk." *See generally id.* He does not dispute that his decisions to open the door, talk to the detectives, or retrieve his identification were voluntary. *See generally id.* And he does not challenge the validity of the warrant on the ground that it omitted facts as he had suggested at the hearing he might do. Doc. 37 at 82–84, 161; *see generally* Docs. 24, 24-1, 29, 35. For its part, the United States does not dispute that Holmes's porch constitutes curtilage. *See generally* Docs. 26, 36. And the United States does not dispute that the drugs, guns, and incriminating statements are "fruits" of the "knock and talk," and, further, that the warrant's probable cause resulted primarily from information learned from the "knock and talk," such that the Court should suppress all of the evidence of the drugs, guns, and incriminating statements if it concludes that the "knock and talk" was unlawful and that suppression is the appropriate remedy.[10] *See generally id.*

The issues are therefore limited. Focusing on his perimeter fence and the four signs posted on his gate and fence, Holmes argues that, under the trespassory test, they served to revoke the implied license and thus turned the detectives' entry onto his property into a common-law trespass, Doc. 35 at 1–3, and that, under the reasonable-expectations test, he had "clearly exhibited an expectation of privacy that

---

[10]Furthermore, in response to Holmes's argument that the Court should suppress a statement that he had made (that he had "a mini-14 in the safe") on *Miranda* grounds, Doc. 24-1 at 7, the prosecutor represented that she did not plan to use that statement, Doc. 37 at 160.

no member of the public will enter the property and approach the house" that society is prepared to accept as reasonable, Doc. 24 at 8. The United States disagrees. Docs. 26, 36. Emphasizing that Holmes's house and porch are visible from the street and that his main gate had been open, the United States argues that he had not done enough to revoke the implied license or manifest a subjective expectation of privacy that would have precluded a "knock and talk," much less one that society is willing to accept as reasonable. Doc. 26 at 5–10; Doc. 36 at 1–4.

As the above mixed opinions would suggest, Holmes's motion presents a question on which reasonable jurists might disagree. Ultimately, with the benefit of the Supreme Court's recent "knock and talk" jurisprudence and the Eleventh Circuit's still-binding precedent requiring an "express" revocation of the implied license, I conclude that the detectives did not violate the Fourth Amendment; through his fence and signs, Holmes had clearly demarcated his property and declared his desire to keep trespassers off of it, but had not expressly revoked the license implied by the country's habits for others (deliverymen and the like) to go to his front door and knock on it.[11] With the implied license intact, the detectives did not commit a common-law

---

[11]A defendant has the burden of establishing that a warrantless search had occurred. *United States v. Bachner*, 706 F.2d 1121, 1125–26 (11th Cir. 1983). If he satisfies that burden, the burden shifts to the United States to establish the search's legality. *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984). The burden for both is a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). Here, then, Holmes has the initial burden of establishing by a preponderance of the evidence that the detectives had conducted a search in the constitutional sense (i.e., a common a common-law trespass upon an area that the Fourth Amendment protects together with an attempt to find something or gain information there, *Jones*, 132 S. Ct. at 951 n.5).

trespass onto his protected curtilage (the trespassory test), and he had not manifested a subjective expectation of privacy that no one would approach his front door and knock on it (the reasonable-expectations test). His front porch is close to and visible from the street. Def. Ex. 1A. His front door is visible through the top half of the porch walls. Tr. 147, 149−50; Def. Ex. 2C. The fence was low and its chain-link structure did not shield the house or anything else outside from public view. Def. Ex. 1A. The path from the street to the porch door was short and unobstructed. Tr. 87−88; Def. Ex. 1A. The main gate was both unlocked and open.[12] Tr. 25, 60. The dog sign at that primary point of entry, Tr. 50; Def. Ex. 1B, did not clearly express that no one was welcome to pass through and knock on the front door; rather, it can reasonably be read either as a tort measure (if you enter to, say, deliver a package, watch out for my dog, who might bite you) or as a privacy measure (if you go past this gate, my dog will bite you). Likewise the other three signs; Holmes posted them not at that point of entry but off to the side of it. Gov't Ex. 3; Def. Ex. 1A. The "no trespassing" sign was on the fence in front of the grassy lawn. Def. Ex. 1A. In that location and by use of the legal term of art, "trespass," the sign clearly marked the property as private and expressed Holmes's desire to exclude people in the surrounding dangerous area from entering it without his permission and putting it to their own use, but not necessarily from merely passing through the nearby main gate to approach the front door and knock on it. The "no trespassing, private property" and the other "beware of

---

[12] *See United States v. Tolar*, 268 F.3d 530, 532 (7th Cir. 2001) ("An open gate invites entry, and a chain-link fence does little to assert a privacy interest (as opposed to a property interest) in details visible from outside the fence.").

the dog" signs were on the sliding gate in front of the driveway construction project. Gov't Ex. 3; Def. Ex. 1A. In that location, and again by use of those words, the signs clearly marked the property as private and expressed Holmes's desire to keep people from entering the project or helping themselves to the construction material, but, again, not necessarily from passing through the nearby gate to approach the front door and knock on it. The detectives did not wander about; they walked straight to the front door using the path any visitor would use. Tr. 28, 61–63, 89. Holmes did not tell either the second informant or the detectives to get off of his porch, and he in fact opened his front door and spoke to them, Tr. 17, 30–31, 58, 67, 128, even though he did not have to do so. Taken together, those circumstances do not serve as an express "notice or order," *see Breard*, 341 U.S. at 626, or other revocation of the implied license to approach the front door and knock on it. Just as a deliveryman could have approached Holmes's front door and knocked on it, so too the detectives. *See Jardines*, 133 S. Ct. at 1415–16. And in light of the intact nature of the implied license, the "knock and talk" was not unreasonable, whether viewed under the trespassory or the reasonable-expectations test. Thus, I conclude that the detectives did not violate the Fourth Amendment.

There is one more "knock and talk" issue. Pointing to when he had gone inside to retrieve his identification and contending that Detective Thompkins had "pressed closer" to the front door "for the *specific purpose* of smelling for" marijuana, Holmes adds that, fence and signs aside, Detective Thompkins, like the officers with the drug-sniffing dogs in *Jardines*, had engaged in an exploratory search outside the limits of

the "knock and talk" exception. Doc. 35 at 2 (emphasis in original). That argument does not warrant as much attention as the argument concerning the effect of the fence and signs on the legality of the "knock and talk." Unlike in *Jardines*, 133 S. Ct. at 1416, the detective's behavior both on December 19 (the attempted "knock and talk") and December 29 (the successful "knock and talk") objectively reveals a purpose to knock on his door and ask him questions about the complaint of drug-dealing there with the hope of getting answers or possible consent to search, not to enter his porch and to sniff around, look through the windows, or poke around the planters, Tr. 17–19, 28–29, 59, 61–63, 88–89, 102, 132–34, 137–39. Detective Thompkins smelled the marijuana first while talking to Holmes and next upon moving closer to the front door in response to a suspicious sound suggesting to him that Holmes might be inside destroying evidence. Tr. at 32–33, 79–80. Nothing in *Jardines* or the Fourth Amendment cases before it required him to conduct the lawful "knock and talk" with his eyes shut, ears closed, or nose pinched, or to disregard any sensation once he experienced it. Indeed, any rule requiring inquiring officers to stand still in response to suspicious sounds would unnecessarily put at risk evidence or them (particularly here had Holmes acted on his alleged shootout thought), and any rule requiring them to ignore scents would effectively serve to defeat a goal of the knock-and-talk recognized as legitimate. *See United States v. Charles*, 29 F. App'x 892, 898 (3d Cir. 2002) (officer may obtain warrant based on "plain smell" of marijuana from inside house during lawful "knock and talk"); *c.f. Greenwood*, 486 U.S. at 41 ("[P]olice cannot reasonably be expected to avert their eyes from evidence of criminal activity that

26

could have been observed by any member of the public."). Thus, already lawfully on Holmes's porch to conduct the "knock and talk," Detective Thompkins's step toward the front door in response to a suspicious sound from inside did not transform his lawful "knock and talk" into an unlawful one.

**B.     *If the detectives had violated the Fourth Amendment, the exclusionary rule would apply.***

The United States argues that even if the detectives had violated the Fourth Amendment by conducting a "knock and talk" at Holmes's house, suppression nevertheless would be unwarranted because their conduct does not evince intentional, reckless, or grossly negligent disregard of his Fourth Amendment rights that would justify that extreme remedy and its attendant substantial societal costs. Doc. 26 at 10−13. He argues that the exclusionary rule applies. Doc. 35 at 4−5.

The most recent Supreme Court cases on the exclusionary rule are *Herring v. United States*, 555 U.S. 135 (2009), and *Davis v. United States*, 131 S. Ct. 2419 (2011). In *Herring*, the Court held that the rule does not apply if an officer arrests a defendant based on an outstanding arrest warrant that turns out to have been wrong because of a negligent booking error. 555 U.S. at 147−48. In *Davis*, the Court held that the rule does not apply if an officer conducts a search in reliance on clearly binding precedent that the Court later overrules. 131 S. Ct. at 2434.

In those cases, the Court observed that the exclusionary rule is a prudential doctrine that it had created to safeguard the Fourth Amendment, *Davis*, 131 S. Ct. at 2426, in response to "intentional conduct that was patently unconstitutional," *Herring*, 555 U.S. at 143. The Court cautioned that exclusion is neither a personal

27

right nor a right to redress injury caused by a Fourth Amendment violation. *Davis*, 131 S. Ct. at 2426; *Herring*, 555 U.S. at 141. Application of the rule, the Court said, is appropriate only when the deterrence benefit of suppression outweighs its substantial societal costs of ignoring reliable, trustworthy evidence bearing on guilt or innocence and, in many cases, of letting a possibly dangerous criminal remain in the community without punishment. *Davis*, 131 S. Ct. at 2426–27; *Herring*, 555 U.S. at 141. The deterrence benefit of suppression, the Court continued, is directly related to the culpability of the officer involved. *Davis*, 131 S. Ct. at 2427; *Herring*, 555 U.S. at 143. The Court emphasized: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring*, 555 U.S. at 144. The Court added that if officers act with an objectively reasonable good-faith belief that their conduct is lawful or if their conduct results only from simple, isolated negligence, "the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 131 S. Ct. at 2427–28 (internal quotation marks omitted). The Court concluded in *Davis*: "We have stated before, and we reaffirm today, that the harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity." *Id.* at 2429 (internal quotation marks omitted).

The concurrence in *Davis* said that the case did not present "the markedly

different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 2435 (Sotomayor, J., concurring). The concurrence opined that the rule would still apply in those cases because officers otherwise would not have "'incentive to err on the side of constitutional behavior.'" *Id.* (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)). That view is supported by the majority opinion's statement that "defendants in jurisdictions in which [a given Fourth Amendment] question remains open will still have an undiminished incentive to litigate the issue." *See id.* at 2433.

But the dissent in *Davis* expressed that the decision went much further because an officer who conducts a search in the face of unsettled law (for example, if a case is merely suggestive, explains only "how to treat roughly analogous instances," or "just does not exist") would not be any more culpable than an officer who does so in the face of binding but ultimately erroneous precedent. *Id.* at 2439 (Breyer, J., dissenting). The dissent observed that *Herring*'s dicta had already led courts away from the exclusionary rule absent findings that officers had acted with more than mere negligence. *Id.* at 2439−40 (citing *United States v. Julius*, 610 F.3d 60, 66−67 (2d Cir. 2010), and *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010)).

Some courts, in accordance with the rationale in *Davis*'s concurrence, have held or stated in dictum that *Davis* is specific, narrow, and applicable only if an officer had had acted in accordance with clear, binding precedent.[13] But other courts, applying

---

[13]*See, e.g., United States v. Sparks*, 711 F.3d 58, 64−65 (1st Cir. 2013); *United States v. Robinson*, 903 F. Supp. 2d 766, 782–85 (E.D. Mo. 2012); *United States v. Lujan*, No. 2:11CR11-SA, 2012 WL 2861546, at *2–3 (N.D. Miss. July 11, 2012)

the broader principles of the Court's own exclusionary rule as articulated in both *Herring* and *Davis*, and in accordance with the concern expressed in *Davis*'s dissent, have held or stated in dictum that *Davis* extends further to cases in which an officer had acted in objectively reasonable reliance on non-binding precedent, an officer had acted in objectively reasonable reliance on a body of case law, or the weighing of deterrence value against societal costs otherwise did not warrant suppression.[14]

For its part, the Eleventh Circuit has only had the occasion to address the

---

(unpublished); *United States v. Lee*, 862 F. Supp. 2d 560, 567–70 (E.D. Ky. 2012); *United States v. Katzin*, No. 11-226, 2012 WL 1646894, at *7–10 (E.D. Pa. May 9, 2012), *aff'd* 732 F.3d 187 (3d Cir. 2013), *opinion vacated and en banc rehearing granted by* No. 12-2548, 2013 WL 7033666 (3d Cir. Dec. 12, 2013).

[14]*See, e.g., United States v. Davis*, 690 F.3d 226, 251–57 (4th Cir. 2012); *Julius*, 610 F.3d at 66–67; *Master*, 614 F.3d at 243; *United States v. Wright*, 493 F. App'x 265, 271–73 (3d Cir. 2012); *United States v. Fugate*, 499 F. App'x 514, 518–20 (6th Cir. 2012); *United States v. Clark*, No. 1:13-cr-84, 2014 WL 2895457, at *4 (E.D. Tenn. June 26, 2014) (to be published); *United States v. Keith*, 980 F. Supp. 2d 33, 45–46 (D. Mass. 2013); *United States v. Taylor*, 979 F. Supp. 2d 865, 876–78 (S.D. Ind. 2013); *United States v. Rose*, 914 F. Supp. 2d 15, 22–24 (D. Mass. 2012); *United States v. Oladosu*, 887 F. Supp. 2d 437, 442–48 (D.R.I. 2012); *United States v. Ortiz*, 878 F. Supp. 2d 515, 539–42 (E.D. Pa. 2012); *United States v. Baez*, 878 F. Supp. 2d 288, 293–97 (D. Mass. 2012); *United States v. Leon*, 856 F. Supp. 2d 1188, 1193–95 (D. Haw. 2012); *United States v. Mundy*, No. 5:13-114-DCR, 2013 WL 5652664, at *8–9 (E.D. Ky. Oct. 16, 2013) (unpublished); *United States v. Fugate*, No. 3:09-cr-165, 2013 WL 3207083, at *3–9 (S.D. Ohio June 24, 2013) (unpublished); *United States v. Dawson*, No. 5:13-cr-7-DCR-REW, 2013 WL 1332573, at *14–15 (E.D. Ky. Mar. 15, 2013) (unpublished), *adopted by* 2013 WL 1320773 (E.D. Ky. Mar. 29, 2013); *United States v. Swearingen*, No. CR 12-26-M-DLC, 2013 WL 174479, at *7–8 (D. Mont. Jan. 8, 2013) (unpublished); *United States v. Guyton*, No. 11-271, 2013 WL 55837, at *3–6 (E.D. La. Jan. 3, 2013) (unpublished); *People v. Hudson*, No. 303437, 2012 WL 6035102, at *10–11 (Mich. Ct. App. Nov. 29, 2012) (unpublished); *United States v. Ford*, No. 1:11-CR-42, 2012 WL 5366049, at *9–11 (E.D. Tenn. Oct. 30, 2012) (unpublished); *Commonwealth v. Turner*, 84 Va. Cir. 406, at *6–8 (Va. Cir. Ct. Apr. 9, 2012); *United States v. Luna-Santillanes*, No. 11–20492, 2012 WL 1019601, at *9 n. 5 (E.D. Mich. Mar. 26, 2012) (unpublished); *People v. Robinson*, 224 P.3d 55, 68–71 (Cal. 2010).

Supreme Court's opinions in both *Herring* and *Davis* in cases in which officers had been relying on clear, binding precedent. *See, e.g., United States v. Ransfer*, 749 F.3d 914, 918 (11th Cir. 2014); *United States v. Smith*, 741 F.3d 1211, 1218−25 (11th Cir. 2013); *United States v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012). But *Davis* had originated in the Eleventh Circuit in an opinion rendered after *Herring. United States v. Davis*, 598 F.3d 1259 (11th Cir. 2010), *aff'd* 131 S. Ct. 2419. In holding that the exclusionary rule does not apply if an officer relies on clear, binding precedent that is later overruled, the Eleventh Circuit added in dictum: "We stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation. We have not forgotten the importance of the incentive to err on the side of constitutional behavior, and we do not mean to encourage police to adopt a let's-wait-until-it's-decided approach to unsettled questions of Fourth Amendment law." *Id.* at 1266−67 (internal quotation marks omitted).

As the above discussion on whether the detectives had violated Holmes's Fourth Amendment rights by conducting a "knock and talk" at his house indicates, they had not been following clear, binding precedent allowing them to do so in light of the perimeter fence and signs. If the broader principles of the exclusionary rule as articulated in *Herring* and *Davis* required, in each case, a balancing that favors deterrent value (assessed by officer culpability) to justify application of the exclusionary rule, I would conclude that suppression would be unwarranted even if the detectives had violated the Fourth Amendment. The societal costs would be high insofar as application of the rule would result in the suppression of the United States'

entire case and the resulting dismissal of a serious drug and gun case against a possible armed career criminal.[15] On the other side, the deterrence value would not be as weighty insofar as the detectives had not evinced intentional, reckless, or grossly negligent disregard of the Fourth Amendment.

What was the state of the law when the detectives arrived at Holmes's house last December 29? The Eleventh Circuit had held that an officer may conduct a "knock and talk" unless the homeowner expressly revokes the implied license. *Taylor*, 458 F.3d at 1204. The Supreme Court had twice sanctioned the "knock and talk" as a valid investigatory tool. *Jardines*, 133 S. Ct. at 1415−16; *King*, 131 S. Ct. at 1862. The Supreme Court had held that an officer may not use a drug-sniffing dog during a "knock and talk." *Jardines*, 133 S. Ct. at 1416. In the open-fields context, the Supreme Court had held that "no trespassing" and similar measures do not serve to expand privacy rights. *Oliver*, 466 U.S. at 182−83. In the "knock and talk" context, state and federal courts had greatly varied in their approaches, with no clearly binding precedent one way or the other and only dictum from the governing state appellate court that "no trespassing" signs alone would serve to revoke the implied license. *See Powell v. State*, 120 So. 3d 577, 584 (Fla. 1st DCA May 22, 2013).[16] The Supreme Court had held that an officer must obtain a warrant before entering a private area

---

[15]The superseding indictment alleges that Holmes has three prior felony convictions for the sale or delivery of cocaine and, for his alleged gun crime, therefore is subject to a 15-year minimum prison term under the Armed Career Criminal Act, 18 U.S.C. § 924(e). Doc. 17 at 2−3.

[16]The JSO detectives here served Duval County. Duval County is in the Fourth Judicial Circuit. Fla. Stat. § 26.021(4). The First District Court of Appeal includes the Fourth Judicial Circuit. Fla. Stat. § 35.02.

based only on a complaint of possible drug activity and the smell of drugs. *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). The Eleventh Circuit, in non-binding precedent, had held that if an officer is conducting a lawful "knock and talk," he may make plain-view observations and use them to support a warrant application. *Cha*, 431 F. App'x at 797; *Cox*, 391 F. App'x at 758. And the Supreme Court had held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements by a suspect during a custodial interrogation without prior warning. *Miranda v. Arizona*, 384 U.S. 436, 468–74 (1966).

Faced with that law, responding to a high-priority complaint about alleged drug-dealing at Holmes's house, and not wanting to give up after two failed attempts to gather evidence from confidential informants, the detectives followed all clearly binding precedent: they entered an unlocked and open gate, Tr. 25, 60, they went straight to the front door and knocked on it, *id.* at 28, 61–63, 89, they did not bring a drug-sniffing dog with them, *see id.* at 20, 102, they sought a warrant based on the marijuana smell rather than entering his house without one, *id.* at 34–36, 119, and they informed Holmes of his *Miranda* rights when their interrogation of him became a custodial one, *id.* at 38. As to the only unsettled area of the law (whether the perimeter chain-link fence and "no trespassing" and similar signs revoked the implied license despite the unlocked and ajar gate and no one expressly telling them to stay off the property), they erred on the side of moving forward with their investigation, although not necessarily concertedly so. As found, only the "beware of the dog" sign on the main gate had been significant to them (they did not want to get bitten). Those

33

circumstances, taken together, do not evince intentional, reckless, or grossly negligent disregard of the Fourth Amendment. Nevertheless, if detectives had violated the Fourth Amendment by conducting the "knock and talk" or by moving closer to the front door in response to a suspicious sound, I recommend denying the United States' request to suspend operation of the exclusionary rule in light of the unsettled area of the law, the statement in *Davis*'s majority that "defendants in jurisdictions in which [a given Fourth Amendment] question remains open will still have an undiminished incentive to litigate the issue," 131 S. Ct. at 2433, and the Eleventh Circuit's strong dictum in its own *Davis* decision forecasting how district courts here should apply the court-created rule: "We stress … that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation," 598 F.3d at 1266.

## III. Recommendation

Thus, I recommend denying Holmes's motion to suppress, Doc. 24. If you conclude that the detectives had violated the Fourth Amendment, I recommend denying the United States' request to suspend operation of the exclusionary rule, Doc. 26 at 10−13.

## IV. Objections

Within 14 days after being served with a report and recommendation, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). Failure to do so "waives [the] party's right to review." *Id.*; *accord United States v. Garcia–Sandobal,* 703 F.3d 1278, 1283

(11th Cir. 2013). Although a "district judge retains the authority to review any magistrate judge's decision or recommendation whether or not [specific] objections are timely filed," Fed. R. Crim. P. 59 (2005 advisory comm. notes), without specific objections, the Eleventh Circuit Court of Appeals will deem waived appellate review of a district judge's order adopting a report and recommendation that a motion to suppress be denied even if the district judge had conducted a de novo review, *United States v. Bowleg*, No. 12–15797, 2014 WL 2198517, at *4, *7 (11th Cir. May 28, 2014) (unpublished); *United States v. Brache*, 543 F. App'x 930, 931 (11th Cir. 2013). Thus, to avoid waiver of review of any particular findings or the recommendations here, the parties must file specific written objections by **August 25, 2014**.[17]

**Entered** in Jacksonville, Florida, on August 8, 2014.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   The Honorable Timothy J. Corrigan
     Counsel of Record

---

[17]*See* Fed. R. Crim. P. 45(c) (adding three days after period otherwise would expire if party must act within a specified period after service and service is made by electronic filing as provided by Federal Rule of Civil Procedure 5(b)(2)(E)).