## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case No. 3:14-cr-21-J-32PDB

MICHAEL HOLMES

_____

# O R D E R

When law enforcement officers, without a warrant, enter a homeowner's fenced property through a partially open gate with a "No Trespassing" sign posted on the fence nearby, and then proceed through an unlocked screen door onto an enclosed front porch and execute a "knock and talk" with the homeowner at the front door to his home, have they violated the Fourth Amendment?

Defendant Michael Holmes is charged in a three-count superseding indictment with possession of firearms by a convicted felon and possession with the intent to distribute cocaine and cocaine base. (Doc. 17). Holmes moves to suppress all evidence obtained subsequent to law enforcement's entry into his enclosed porch on December 29, 2013. (Doc. 24). The government responded in opposition (Doc. 26) and Holmes replied (Doc. 29). The assigned United States Magistrate Judge held an evidentiary hearing on May 22, 2014 (Doc. 37) and, at her instruction, the parties filed supplemental briefs (Doc. 35; Doc. 36). The Magistrate Judge issued a comprehensive Report and Recommendation (Doc. 43), to which Holmes objected (Doc. 46).

Because the Fourth Amendment issue seemed significant and unsettled, the Court appointed the Federal Public Defender to serve as co-counsel for Holmes and

asked the appellate section of the U.S. Attorney's Office for its views. Upon Court Order, the parties then filed supplemental briefs. (Doc. 62; Doc. 63). The Court heard oral argument on the motions on April 27, 2015, and the transcript of that proceeding (Doc. 73) is incorporated herein. Before and after oral argument, both parties brought additional case law to the Court's attention. (Doc. 48; Doc. 52; Doc. 65; Doc. 67; Doc. 71) (referencing Brown v. State, 152 So. 3d 619 (Fla. 3d DCA 2014); United States v. Bearden, 780 F.3d 887 (8th Cir. 2015); Robinson v. State, No. 2D13-4412, 2015 WL 2431739 (Fla. 2d DCA May 22, 2015); and United States v. Walker, 799 F.3d 1361 (11th Cir. 2015)). On October 19, 2015, the Court held a supplemental hearing; the transcript of that hearing (Doc. 85) is also incorporated by reference.

## I.     FACTS

The United States presented three witnesses at the suppression hearing before the Magistrate Judge: Jacksonville Sheriff's Office Detectives Gary Thompkins and Z.M. Anderson and Bureau of Alcohol, Tobacco, and Firearms Special Agent Richard Samples. Holmes did not present any witnesses. Both sides presented exhibits without objection. The Magistrate Judge found the testimony of the law enforcement officers to be credible. The following recitation of facts is drawn from the Magistrate Judge's Report and Recommendation (Doc. 43), and from the transcript of the suppression hearing (Doc. 37) and exhibits admitted at that hearing (Doc. 42 attachments).

Michael Holmes lives in a single-family home on a street with few houses.[1] (Doc. 37 at 13). The property is surrounded by a chain-link fence with a large, chain-link two-door driveway gate. (Doc. 37 at 13; Doc. 42-8). The mailbox is outside of the fence. (Doc. 43 at 3). The fence and the gate are approximately four feet tall; they do not obstruct the view of the home in any way. (Doc. 37 at 21; Doc. 42-8). The main driveway gate has a standard latch, but no lock. (Doc. 37 at 22). Approximately five feet inside the gate, to the left of the driveway, is a screened-in porch approximately ten feet by ten or twelve feet. (Doc. 37 at 22). There is no separate walkway or path leading to the porch steps; the access is from the driveway. (Doc. 42-9). The porch is raised four steps off the ground and rests on concrete blocks; the porch roof appears to be an extension of the roof of the house; the bottom half of the porch walls is wood lattice, and the top half is mesh screen which is torn or missing in some places (Doc. 42-10 at 1). The mesh screen partially obstructs the view of the porch's interior such that someone outside the property's fence can see whether there is a person on the porch but cannot distinguish a face, but the view from inside the porch looking out through the screen is not obstructed (Doc. 37 at 130-133; Doc. 42-10 at 2). Within the screened-in porch, which has a door of its own, is Holmes' front door, which is protected by a burglar-bar door with a mesh screen. (Doc. 42-10 at 1-2).[2] A wall lantern is affixed to the right of the front door. (Doc. 42-10 at 2). The front door to the home has neither a door bell nor a knocker. (Doc. 42-10 at 2).

---

[1] Two pictures of the front of the house, taken on an unspecified date after the events at issue, are attached as Exhibit A.

[2] A picture of Holmes' front door is attached as Exhibit B.

3

Facing the house from the street, there is a "BEWARE OF DOG" sign on the left portion of the driveway gate. (Doc. 42-8). About four feet to the right of the driveway gate is a "NO TRESPASSING" sign. (Doc. 42-8). On December 29, 2013, another driveway was under construction approximately twenty feet to the right of the main driveway. (Doc. 42-2; Doc. 42-3). A sliding gate operating as a continuation of the chain-link fence sat in front of the construction project, which held piles of lumber and other construction materials. (Doc. 42-2; Doc. 42-3). The sliding gate had a "BEWARE OF DOG" sign as well as a "PRIVATE PROPERTY" sign that said "NO TRESPASSING" in small letters underneath. (Doc. 42-8).

On November 8, 2013, the Jacksonville Sheriff's Office received a narcotics-based complaint from a private citizen regarding Holmes' house. (Doc. 37 at 12). Detectives then twice instructed confidential informants to attempt to purchase drugs at the home, but the informants were rebuffed on each attempt. (Doc. 37 at 17). A team of detectives went back to the home on December 19, 2013, but received no answer when they knocked on the door. (Doc. 37 at 17).

The Magistrate Judge described the events that followed:[3]

> On December 29, in the afternoon, [Detective Thompkins] and Detective Anderson, along with two other detectives, all in tactical clothes and masks to protect their identities, returned to try another "knock and talk." Tr. 20, 102. A pick-up truck was parallel parked in front of the house, outside of the fence, and partially blocking the completed driveway. Tr. 23, 60–61. The main gate was "partially open." Tr. 25, 60. Reacting to the "beware of the dog" sign on the gate [ ], Detective Thompkins rattled the gate [ ], and the dog

---

[3] The Magistrate Judge cites to Doc. 37, the hearing transcript, as "Tr." and to Doc. 42-12, the search warrant, as "Def. Ex. 4."

ignored them [ ]. Tr. 21, 60, 104, 137–38.

. . . .

Detective Thompkins and another detective went through the main gate, walked up to and opened the porch door, walked through the porch, and knocked on the front door. Tr. 28, 61–63, 89. Detective Thompkins put his mask up so that his face was visible. Tr. 20. The porch was bare except for a few empty planters. Tr. 88−89. To ensure everyone's safety, the other detectives stayed outside of the fence in front of the house. Tr. 103. At least one of them stood near the "no trespassing" sign on the fence. Tr. 37.

Holmes, shirtless, opened the door and said hello. Tr. 30–31, 67. Detective Thompkins introduced himself and asked if Holmes would mind stepping outside to speak to him for a second. Tr. 31. He stepped outside. Tr. 31. Detective Thompkins asked his name, if he owned the house, and if he had identification. Tr. 31. He identified himself and said that it was inside. Tr. 31. Detective Thompkins asked if he would get it. Tr. 31. He said yes and went back inside, closing the burglar-bar door behind him but leaving the front door open. Tr. 32, 64. The detectives had but did not draw guns. Tr. 34, 66. The tone of the conversation was "very calm." Tr. 33.

Holmes took longer than what seemed appropriate to Detective Thompkins. Tr. 32. Upon hearing a suspicious sound that he thought might be Holmes destroying evidence, he stepped closer to the front door. Tr. 32, 64−65, 69−70, 79. There, he smelled freshly burnt marijuana wafting from inside. Tr. 32, 64−65, 70. He thought that he had smelled it before, when he had been talking to Holmes, but the smell was stronger closer to the front door. Tr. 71. The other detective confirmed the scent and radioed the new development to Detective Anderson, who then joined them on the porch. Tr. 35, 140, 115.

When Holmes returned with his identification, Detective Thompkins told him about the complaint of drug-dealing there and asked him if he used drugs, like marijuana. Tr. 33–34. He responded, "'Yeah, I smoke marijuana.'" Tr. 34. Detective Thompkins said they could smell it and asked if he had any inside. Tr. 34. He said no. Tr. 34. Detective

5

Thompkins asked if they could search the house. Tr. 34. He said no again. Tr. 34, 65. Deciding to get a search warrant, Detective Anderson handcuffed him and moved him to the tailgate of the pick-up truck. Tr. 34–36. He impulsively said that he had "had a good run" and was "not going to see the streets anymore." Tr. 35. He remained calm and never told any of the detectives to get off of his property. Tr. 33−34, 111−12, 140−141.

While Detective Thompkins was drafting a warrant affidavit, Holmes asked if he could go inside to get a shirt. Tr. 36–37, 112. The detectives told him that they would have to escort him. Tr. 37, 112. While he led Detective Anderson and another detective to his bedroom, Detective Anderson saw marijuana in a bag on a desk in his living room and marijuana cigarettes on a dresser in his bedroom. Tr. 37, 114–115, 117. Detective Thompkins added those discoveries to the affidavit. Tr. 37.

Detective Thompkins obtained a warrant to search the house for drugs, drug paraphernalia, and cash. Tr. 36, 119; Def. Ex. 4. After he returned, he advised Holmes of his *Miranda* rights. Tr. 38. In a safe in a bedroom and elsewhere, the detectives found a dozen guns, ammunition, a bulletproof vest, a tactical vest, $3600, pills, marijuana, and cocaine. Tr. 39.

(Doc. 43 at 6-9).

Although the detectives only specifically recalled seeing the "BEWARE OF DOG" sign, based on their training, the number of times they had visited the home, and the location of the signs, the Magistrate Judge inferred that the detectives saw all four signs (the two "BEWARE OF DOG" signs, the "NO TRESPASSING" sign, and the "PRIVATE PROPERTY NO TRESPASSING" sign). (Doc. 43 at 6-7).

The Court adopts the Magistrate Judge's Findings of Fact.[4]

_____

[4] In his briefs Holmes contends that the gate was closed, but the Magistrate Judge found that it was "partially open," a finding consistent with the testimony about the gate offered at the suppression hearing from witnesses who she found credible.

## II.    LAW

### A.    Introduction

Holmes argues that any evidence uncovered on December 29, 2013 was the fruit of an unlawful search and must be suppressed under the Fourth Amendment. A "search" within the meaning of the Fourth Amendment "originally was tied to common-law trespass and involved some trespassory intrusion on property." United States v. Davis, 785 F.3d 498, 506 (11th Cir. 2015) (citation omitted). The Supreme Court later "added a separate test—the reasonable-expectation-of-privacy test—to analyze whether a search occurred for purposes of the Fourth Amendment." Id. at 507 (citation omitted). As the Magistrate Judge aptly described in her Report and Recommendation:

> As a result, there are two distinct tests for assessing whether a violation occurred: the trespassory test and the reasonable-expectations test. United States v. Jones, 132 S. Ct. 945, 952 (2012).
>
> Under the trespassory test, a search occurs if there is a common-law trespass (willful entry or remaining on property without authority, license, or invitation) upon an area that the Fourth Amendment protects (upon a person, house, paper, or effect) together with an attempt to find something or gain information there. Jones, 132 S. Ct. at 951 n.5. The Supreme Court recently applied the test in Jones to hold that officers may not attach tracking devices to cars because doing so constitutes a common-law trespass upon an effect to gather information, id. at 951 . . . .
>
> Based on Justice Harlan's concurrence in Katz v. United States, 389 U.S. 347, 360 (1967), the reasonable-

See Doc. 43 at 1, 6; Doc. 37 at 21, 25, 41, 60, 62, 87. The Court overrules Holmes' objection to this factual finding; like the Magistrate Judge, I find the gate was partially open when the detectives arrived on December 29, 2013.

> expectations test is also known as the *Katz* test. Under the
> test, a search occurs if there is an invasion of privacy
> together with an attempt to find something or gain
> information. *Jones*, 132 S. Ct. at 951 n.5. The test involves
> a "two-part inquiry: first, has the individual manifested a
> subjective expectation of privacy in the object of the
> challenged search? Second, is society willing to recognize
> that expectation as reasonable?" *California v. Ciraolo*, 476
> U.S. 207, 211 (1986).

(Doc. 43 at 10-12).

A person's home is at the core of the Fourth Amendment's protection against unreasonable searches and seizures. See Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013). This protection extends to the curtilage or area immediately surrounding and associated with the house. Id. Where officers without a warrant gather information in the curtilage of the house, they engage in an unreasonable search unless their conduct is explicitly or implicitly permitted by the homeowner.[5] See id.

English common law strictly forbade the entry of any man upon his neighbor's property without permission. Id. at 1415. License to enter, however, may be implied from the country's habits. Id. In America, an "implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. As explained in Jardines, "[c]omplying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." Id.

---

[5] There may be other exceptions, such as exigent circumstances, which might permit such a warrantless search of the curtilage. See, e.g., United States v. Taylor, 458 F.3d 1201, 1205 n.1 (11th Cir. 2006).

Law enforcement officers lacking a warrant may, like any other citizen, take advantage of this implied license. <u>Kentucky v. King</u>, 131 S. Ct. 1849, 1862 (2011); <u>see also</u>, <u>United States v. Taylor</u>, 458 F.3d 1201, 1204 (11th Cir. 2006) (internal quotation and citation omitted) ("Thus, officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may."). When used by law enforcement officers to make inquiry of a home's occupants, this widely used investigatory tool is known as a "knock and talk." <u>Taylor</u>, 458 F.3d at 1204. During a "knock and talk," officers approach a house with or without probable cause and knock on the door to, for example, question the resident about possible criminal activity there or elsewhere, or try to obtain consent to search. <u>King</u>, 131 S. Ct. at 1860. A resident is free to not open the door and to not talk if he does open the door. <u>Id.</u> at 1862. "And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." <u>Id.</u> During the course of a lawful knock and talk, officers may make plain-view observations and use them to support a warrant application.[6] <u>United States v. Cha</u>, 431 F. App'x 790, 797 (11th Cir. 2011);

---

[6] While officers need not avert their eyes in the course of conducting a lawful knock and talk, they may not exceed the scope of the implied license to approach a home's front door by conducting a search. For example, in <u>Jardines</u>, officers brought a drug-sniffing dog onto Jardines' front porch and then used the dog's alert at the base of the front door as a basis to secure a search warrant of the home. 133 S. Ct. at 1414. The Supreme Court explained that "the background social norms that invite a visitor to the front door do not invite him there to conduct a search[;]" thus, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence" exceeded the customary invitation extended to any private citizen to approach a home. <u>Id.</u> at 1416.   <u>See also</u> <u>United States v. Schultz</u>, No. 13-20023, 2013 WL 2352742, at *6 (E.D. Mich. May 29, 2013) (holding that while officers

United States v. Cox, 391 F. App'x 756, 758 (11th Cir. 2010).

However, the license granted to enter property to knock on a person's door is not unlimited. Rather, it extends unless and until the homeowner[7] provides "express orders" to the contrary. Taylor, 458 F.3d at 1204. In determining the scope of the implied license, and therefore whether a police officer's approach to the front door was permissible under the Fourth Amendment, courts ask whether a reasonable person could do as the police did. Jardines, 133 S. Ct. at 1415-16. Factors that may aid in the analysis include the appearance of the property, whether entry might cause a resident alarm, what ordinary visitors would be expected to do, and what a reasonably respectful citizen would be expected to do. Id. at 1415 n.2.

Here, because the analysis under the trespassory test asks whether social norms would permit a reasonably respectful citizen to approach the front door as the police did, id., it largely overlaps with the reasonable expectations test. Cf. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring) (noting that it is not surprising that the two tests align when a case involves a search of a home because the law of property influences societal expectations about what areas are free from governmental intrusion).

Thus, the question presented is whether Holmes expressly revoked the implied license to enter his property. If he did, detectives violated Holmes' Fourth Amendment

were lawfully on defendant's property to conduct a knock and talk, they exceeded the scope of their authority by wandering around his yard away from the house and driveway without his consent in search of marijuana plants).

[7] In this opinion, the terms "homeowner," "occupant," and "resident," all connote someone who is entitled to assert a Fourth Amendment interest in the home.

rights by approaching his front door to conduct a knock and talk. And, if their approach violated Holmes' Fourth Amendment rights, a secondary question is whether the exclusionary rule requires suppression of the evidence seized as a fruit of the knock and talk encounter.

Before turning to these issues, Holmes presented two other points meriting brief discussion:

First, Holmes argues he was coerced to open the front door to his home by fear and intimidation due to the show of force created by four detectives—two on his porch and two outside the fence—all of whom were in tactical gear. (Doc. 46 at 5). The Magistrate Judge found that when the detectives went to the door and knocked, their guns were holstered, Detective Thompkins put his mask up so his face was visible, the detectives did not order Holmes to open the door, and the tone of the subsequent conversation was "very calm." (Doc. 43 at 7-8). Additionally, there is no evidence Holmes saw who was at the door before he opened it or that he was intimidated. The Court rejects Holmes' argument that he was coerced to open the door. Cf. United States v. Thomas, 430 F.3d 274, 277-78 (6th Cir. 2005) (describing indicia of "overbearing tactics that essentially force the individual out of the home," such as drawn weapons, use of spotlights and bullhorns, raised voices, and orders to come out). See also United States v. Glover, 583 F. Supp. 2d 5, 18-20 (D.D.C. 2008) (finding woman's consent to search home was not coerced where none of the four officers drew their weapons, notwithstanding that officers were in tactical gear and had placed

another resident in handcuffs in her presence).[8]

Second, at oral argument before the undersigned (but not in his earlier briefs and therefore not addressed by the Magistrate Judge), Holmes contended that the structure referred to here as his "porch" is actually an extension of his home, and that the detectives' entry into that space was an unlawful entry into his home. The government's position is that the porch is within the curtilage of the home, but disagrees that it is part of the home itself. (Doc. 62 at 3; Doc. 85 at 75-76). The government did not object to Holmes' failure to raise this issue earlier. (Doc. 85 at 74). Neither party cited any legal guidance on this point.

Nowhere is the Fourth Amendment's protection of the individual's "zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ." Payton v. New York, 445 U.S. 573, 589 (1980). For this reason, "the Fourth Amendment has drawn a firm line at the entrance of the house." Id. at 590. "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 589. If the threshold to Holmes' home is at the door of his porch, the detectives' entry into that enclosure would be unlawful.

A porch is typically considered part of the curtilage and, barring revocation of the implied license to enter, a porch may be entered to approach the front door to conduct a knock and talk. See Jardines, 133 S. Ct. at 1415 (defining "[t]he front porch" as "the classic exemplar of an area adjacent to the home" and therefore falling within

---

[8] In so ruling, the Court does not deny that the wearing of tactical gear creates a greater likelihood that a "knock and talk" could become coercive.

the curtilage). In some circumstances, however, a porch can be deemed to be part of the home. See, e.g., State v. Reinier, 628 N.W.2d 460, 462-63, 467 (Iowa 2001) (determining officers' uninvited entry into enclosure was a search of the home because the space was entered through a heavy solid wooden door with a deadbolt lock; the room had the same siding and roofing as the remainder of the house; the windows were glass and covered with blinds; and the space contained the resident's personal belongings); State v. Kriley, 976 S.W.2d 16, 22-23 (Mo. Ct. App. 1998) (finding enclosure was part of the home where, notwithstanding the lack of a door or floor, one exterior wall was made of concrete, brick, wood and glass, another exterior wall was shingled like the house, the roof and flashing were continuous between the house and the structure, the room was wired for electricity, and it held numerous items and was being used for various purposes). On the other hand, where the space is "functionally and structurally different and distinct from the house," and there is no evidence the residents are dwelling within it, courts are unlikely to find that a porch is part of the home. People v. Arias, 535 N.E.2d 89, 92 (Ill. App. Ct. 1989). See also State v. Orr, 179 P.3d 1163, 2008 WL 940778, at *3-4 (Kan. Ct. App. 2008) (porch not part of home where it had a glass front door and glass windows through which a person sitting could be partially seen, space protruded from house and had a porch light fixture near the inner door leading into the main house, room contained plastic lawn furniture and was used for smoking which was not permitted in the house); State v. Edgeberg, 524 N.W.2d 911, 913-15 (Wis. Ct. App. 1994) (space not part of home where entrance to room was through unlocked screen door and room contained washer and dryer).

The porch here appears to share a roof with the main house but is entered through an unlocked screen door, the walls are half screen and half lattice, the space is empty of furnishings and has a porch light near the main locked door into the house. See Exhibits A and B, and supra, pp. 3, 5. The space is "functionally and structurally different and distinct from the house." Arias, 535 N.E.2d at 92. Additionally, if the detectives' view from the street raised any doubt as to whether the porch was part of the home, that doubt was resolved when they approached the unlocked screened porch door which revealed a view of the mainly empty porch interior and the separate burglar-bar front door to the home, confirming that the space they were about to enter was a typical porch. The Court so finds as a fact. Thus, the detectives' entry into the porch to conduct a knock and talk was not an unauthorized entry into Holmes' home in violation of the Fourth Amendment.

## B.   The Burden of Proof

Holmes objects to the Magistrate Judge's conclusion that he has the burden of proving the knock and talk was invalid. (Doc. 63 at 13-14). A defendant has the initial burden of proving that he had a subjective expectation of privacy in the area searched that society is prepared to accept as objectively reasonable. United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008). Only then does the burden shift to the government to prove that the search was nevertheless reasonable because of a recognized exception to the warrant requirement. Id.

Holmes believes that a knock and talk is an exception to the warrant requirement and that the government therefore has the burden of proving that the

knock and talk was valid. Indeed, the Eleventh Circuit has referred to knock and talks as an "exception to the warrant requirement." <u>Taylor</u>, 458 F.3d at 1205. However, <u>Taylor</u> also acknowledged that the Fourth Amendment "is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." <u>Id.</u> at 1204. A proper knock and talk does not violate a defendant's reasonable expectation of privacy because it is limited to areas impliedly open to the public. <u>See</u> <u>United States v. Diaz</u>, No. 1:09CR9-SPM, 2009 WL 3675006, at *2 (N.D. Fla. Oct. 30, 2009) (finding the defendant failed to meet his burden of showing a knock and talk violated a reasonable expectation of privacy because the officers only entered areas impliedly open to the public). As the propriety of a knock and talk goes to the reasonableness of a defendant's expectation of privacy, not to an exception to the warrant requirement, Holmes has the burden of proving, by a preponderance of the evidence, that the knock and talk was invalid.[9]

---

[9] As a practical matter, the allocation of the burden of proof will rarely matter, since whoever holds the burden must only demonstrate the knock and talk's validity or invalidity by a preponderance of the evidence. <u>See</u> <u>United States v. Matlock</u>, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). Here, the Court's decision would be the same even if it were to find that the government had the burden of proving the knock and talk's legality.

### C.     Revoking the Implied License to Enter Private Property[10]

In <u>Taylor</u>, the Eleventh Circuit stated that the implied license to enter private property to knock on a person's door may be revoked by "express orders from the person in possession." 458 F.3d at 1204. Although the Eleventh Circuit has not explained what those "express orders" might be, other courts similarly have held that the revocation of the implied license must be by "clear demonstrations," [11] "unambiguous,"[12] and "obvious to the casual visitor."[13]

At oral argument, the government agreed that a homeowner could provide an express order revoking the implied license by verbally telling visitors that they must leave. (Doc. 73 at 45). The government also agreed, and the case law supports, that a fenced property with a locked gate represents an express order revoking the implied license. <u>See</u> <u>United States v. Victores</u>, No. 10-CR-20716, 2011 WL 3439967, at *5 (S.D. Fla. Feb. 10, 2011) <u>report and recommendation adopted,</u> No. 10-20716-CR, 2011 WL 3424449 (S.D. Fla. Aug. 5, 2011) (finding a knock and talk unconstitutional because

---

[10] This Court is bound to follow precedent from the United States Supreme Court and the Eleventh Circuit. However, while recognizing that some state constitutions provide additional safeguards which can affect the outcome of a particular case, other state and federal courts around the country have addressed the legality of knock and talk encounters, and those decisions are helpful to the analysis.

[11] <u>State v. Grice</u>, 767 S.E.2d 312, 319 (N.C. 2015) (license may be rescinded by homeowner's "clear demonstrations").

[12] <u>State v. Howard</u>, 315 P.3d 854, 860 (Idaho Ct. App. 2013) (message to the public must be "unambiguous").

[13] <u>State v. Christensen</u>, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *8 (Tenn. Crim. App. May 14, 2015) (the revocation of the implied license "must be obvious to the casual visitor who wishes only to contact the residents of a property"), appeal pending, No. W2014-00931-SC-R11-CD (Tenn. Sept. 22, 2015) (order granting leave to appeal).

the officers entered through a closed gate that could only be opened by the homeowner, indicating that a private citizen could not access the house); United States v. Quintana, 594 F. Supp. 2d 1291, 1302 (M.D. Fla. 2009) (holding a knock and talk was unconstitutional where the officers had to jump over a fence with a locked gate to access the property); United States v. Hambelton, No. 1:08CR26-SPM, 2009 WL 722284, at *4 (N.D. Fla. Mar. 18, 2009) (same); United States v. Rodriguez, No. 1:08CR32-SPM, 2009 WL 762203, at *8 (N.D. Fla. Mar. 18, 2009) (holding a knock and talk unconstitutional where a private citizen would have had to jump over a fence or deactivate an electronic gate to reach the defendant's front door). When the locked gate and fence are additionally accompanied by a "No Trespassing" sign, "the homeowner can reasonably expect all [uninvited] visits to cease." Edens v. Kennedy, 112 F. App'x 870, 875 (4th Cir. 2004). See also, United States v. Jones, No. 4:13CR00011-003, 2013 WL 4678229, at *6 (W.D. Va. Aug. 30, 2013) (commenting that "the Fourth Circuit has made it exceedingly difficult for a homeowner to withdraw the implicit consent which underpins the 'knock and talk' rule").

Here, neither Holmes nor anyone acting on his behalf was in his yard telling visitors to go away, and he did not lock the gate to his property.[14] Nonetheless, Holmes contends that he revoked the implied license to approach his front door by surrounding his property with a four-foot tall chain-link fence, placing conspicuous "NO TRESPASSING," "PRIVATE PROPERTY" and "BEWARE OF DOG" signs on the

---

[14] There was no lock on the gate on any of the four occasions detectives went to Holmes' address. As the only testimony came from the detectives, there is no evidence as to whether Holmes ever used a lock on the gate.

fence near the gate and a second "BEWARE OF DOG" sign on the gate, having a dog in the yard, boarding up his garage, obscuring the view to his front door with a lattice and screened porch, having a burglar-bar door, and not having a door knocker or doorbell. (Doc. 63 at 15-16; Doc. 73 at 30-32). Were these steps enough to revoke the implied license to approach his front door?

When it comes to knock and talk jurisprudence, courts consider the effectiveness of all the barriers to entry to determine whether they serve to revoke the implied license. Holmes has a fence and a gate, but where a gate is unlocked or open, a knock and talk is generally permissible. See, e.g., Taylor, 458 F.3d at 1204 (holding that officers could pass through a closed but unlocked gate to conduct knock and talk); United States v. Byle, No. 8:10-CR-419-T-30TGW, 2011 WL 1983359, at *11 (M.D. Fla. Apr. 15, 2011) report and recommendation adopted, No. 8:10-CR-419-T-30TGW, 2011 WL 1983355 (M.D. Fla. May 20, 2011) (same); Nieminski v. State, 60 So. 3d 521, 526 (Fla. 2d DCA 2011) (same). See also, United States v. Tolar, 268 F.3d 530, 532 (7th Cir. 2001) (upholding the search of a business property and explaining that "[a]n open gate invites entry, and a chain-link fence does little to assert a privacy interest (as opposed to a property interest) in details visible from outside the fence"). Indeed, a fence and closed gate are often intended to keep children and pets in, as opposed to keeping visitors out.

But Holmes had more than a fence and gate—he also had a "NO TRESPASSING" sign posted on his fence close to the partially open gate. According to Holmes, the "NO TRESPASSING" sign expressly indicates that no one should enter

18

the fenced-in area of his property for any reason. (Doc. 63 at 16). The government argues that "NO TRESPASSING" means only that passersby should not traipse around on Holmes' property or use the basketball hoop in his front yard or meddle with his construction materials, still leaving deliverymen, salesmen, or neighbors free to walk directly to the front door, knock, and attempt to speak to Holmes. (Doc. 62 at 12-13).

"No Trespassing" signs are commonly used to alert passersby that land that might otherwise appear available for public use for anything from pickup football games to hunting are, in fact, private property that should be treated as such.[15] Thus, a number of states permit the use of "No Trespassing" signs to create additional protection for open lands. For example, while open fields are generally unprotected by Florida's criminal trespass statute, entrance upon open fields posted with "No Trespassing" signs is a violation of the statute.[16] Fla. Stat. §§ 810.09, 810.011(1),

---

[15] In some circumstances, however, "No Trespassing" signs may not even provide that much protection. See United States v. Gardner, 444 F. App'x 361, 363 (11th Cir. 2011) (finding the posting of "No Trespassing" signs irrelevant to a determination of whether a Florida condominium complex's parking lot was open to public use, especially in light of police testimony that the public was free to come and go through the complex as it pleased); United States v. Edmonds, 611 F.2d 1386, 1388 (5th Cir. 1980) (affirming as not clearly erroneous a finding that a dock was open to the public where a police officer testified that the dock had a reputation for being open to the public despite a "No Trespassing" sign at the entrance).

[16] To the extent that Holmes argues the search was unconstitutional if the police committed a trespass under Florida law, that argument is foreclosed by Supreme Court precedent. See California v. Greenwood, 486 U.S. 35, 43 (1988) ("We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs."); Virginia v. Moore, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law."); see also, United States v. Jackson, ___ F. App'x ___, 2015 WL 3938341, at *4 (11th Cir. June 29, 2015) (citing

810.011(5) (2014). Other states similarly protect unimproved, unused, and unfenced land under their criminal trespass statutes only where notice is given to the potential trespasser, including by posting the land with "No Trespassing" signs.[17] See Alaska Stat. Ann. § 11.46.350 (West 2014); Ark. Code Ann. § 5-39-101 (West 2014); Haw. Rev. Stat. § 708-814 (West 2014).

Thus, where a sign says "No Trespassing," it instructs those who seek entry that land is private property and that they are not to do those things on it commonly understood to be trespassing. In Oliver v. United States, 466 U.S. 170 (1984), in upholding a search of open fields with posted "No Trespassing" signs, the Supreme Court explained the difference between the broad property rights protected under the law of trespass and the more narrow privacy interests protected by the Fourth Amendment:

> The law of trespass recognizes the interest in possession and control of one's property and for that reason permits exclusion of unwanted intruders. But it does not follow that the right to exclude conferred by trespass law embodies a privacy interest also protected by the Fourth Amendment. To the contrary, the common law of trespass furthers a range of interests that have nothing to do with privacy and that would not be served by applying the strictures of trespass law to public officers. Criminal laws against

Moore, 553 U.S. at 178) ("[T]he Florida [trespass] statute could not, of its own force, control the outcome [of the lawfulness of the officers' knock and talk] and require the exclusion of the evidence."), cert. denied, ___ S. Ct. ___, 2015 WL 5477814 (Oct. 19, 2015). Florida's trespass laws are, however, relevant insofar as they are suggestive of the common meaning of a "No Trespassing" sign and societal understandings of the reasonable expectation of privacy when such a sign is hung.

[17] Some states more generally provide protection under a criminal trespass statute whenever an individual knowingly enters property that has been posted with adequate notice at the main entrance that entry is forbidden. See, e.g., 720 Ill. Comp. Stat. Ann. 5/21-3 (West 2014); Ind. Code Ann. § 35-43-2-2 (West 2014).

> trespass are prophylactic: they protect against intruders who poach, steal livestock and crops, or vandalize property. And the civil action of trespass serves the important function of authorizing an owner to defeat claims of prescription by asserting his own title. See, e.g., O. Holmes, The Common Law 98-100, 244-246 (1881). In any event, unlicensed use of property by others is presumptively unjustified, as anyone who wishes to use the property is free to bargain for the right to do so with the property owner, cf. R. Posner, Economic Analysis of Law 10-13, 21 (1973). For these reasons, the law of trespass confers protections from intrusion by others far broader than those required by Fourth Amendment interests.

Oliver, 466 U.S. at 183, n.15.

Thus, trespass laws are designed to keep out unwanted intruders, such as vandals, thieves, and squatters, but those laws do not implicate the privacy interests in "persons, houses, papers, and effects" protected by the Fourth Amendment. Id. at 176. To find that a "No Trespassing" sign on its own expressly revokes the implied consent to walk up to a front door and knock, the Court would have to find that the sign means something like, "Do not do those things that would normally be considered trespassing, and also, I now consider anyone walking up to my front door to be a trespasser as well." Perhaps the best support for this interpretation of a "No Trespassing" sign is the oft-cited quote that, "Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy" to walk up to a front door, knock, and ask questions of one who answers. Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964) (emphasis added).[18]

---

[18] Davis is the seminal case announcing the rationale underlying the knock and

One could read <u>Davis</u>' reference to an express order "against any possible trespass" to refer to a "No Trespassing" sign, and therefore conclude that such a sign would revoke the implied license. This interpretation's persuasive value is limited for at least four reasons. First, the court in <u>Davis</u> did not confront, or at least did not discuss, any argument that the defendant revoked the implied license, but instead was only opining about potential ways to revoke it. <u>See id.</u> at 302-06. Second, it is difficult to discern what the <u>Davis</u> court meant by an "express order[ ] . . . against any possible trespass," since the Court did not discuss trespass laws, "No Trespassing" signs, or even use the word "trespass" at any other point in the opinion. <u>See id.</u> Third, while the Eleventh Circuit quoted <u>Davis</u> in laying out the standard in knock and talk cases, it omitted the part about "any possible trespass," instead saying, "'Absent express orders from the person in possession,' an officer may 'walk up the steps and knock on the front door of any man's "castle," with the honest intent of asking questions of the occupant thereof.'" <u>Taylor</u>, 458 F.3d at 1204 (quoting <u>Davis</u>, 327 F.2d at 303). Fourth, the plain meaning of "No Trespassing" is that it prohibits what people ordinarily think of as trespassing, and does not alter the character of an entry that one would not otherwise think to be a trespass, such as the implied license to approach the homeowner's door to knock and talk. <u>See</u> <u>Oliver</u>, 466 U.S. at 183, n.15.

Accordingly, in the absence of another barrier (such as a fence and gate), "No Trespassing" signs do not, in and of themselves, withdraw the implied consent to conduct a knock and talk. <u>See, e.g.</u>, <u>United States v. Hopper</u>, 58 F. App'x 619, 623 (6th

---

talk doctrine. <u>See, e.g.</u>, <u>Taylor</u>, 458 F.3d at 1204 (citing <u>Davis</u>).

Cir. 2003) (holding knock and talk was permissible despite two or three "No Trespassing" signs at entrance to driveway); <u>United States v. Jones</u>, No. 4:13CR00011-003, 2013 WL 4678229, at *1 n.2, *6 (W.D. Va. Aug. 30, 2013) (holding knock and talk was permissible despite at least five signs, two of which were posted on the house, reading "No Trespassing," "Posted: Private Property," and "Keep Out," where no fence or gate surrounded the property); <u>United States v. Schultz</u>, No. 13-20023, 2013 WL 2352742, at *5 (E.D. Mich. May 29, 2013) (finding officers did not violate defendant's rights when they passed "No Trespassing" signs while entering property to conduct knock and talk). <u>But see</u> <u>State v. Christensen</u>, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *12 (Tenn. Crim. App. May 14, 2015) (Williams, J., concurring and dissenting) (questioning why the government is permitted to keep visitors out by posting a single "No Trespassing" sign yet homeowners cannot keep the government out with the same sign), appeal pending, No. W2014-00931-SC-R11-CD (Tenn. Sept. 22, 2015) (order granting leave to appeal).

While neither a fence with an unlocked gate nor a "No Trespassing" sign are by themselves sufficient to withdraw consent to approach an individual's front door, Holmes nevertheless argues that the two combine to expressly revoke consent, especially when added to a variety of other factors present in this case. (Doc. 63 at 15-16). Those other factors, however, have minimal impact on the analysis. That Holmes' front door lacks a knocker or doorbell means little, as many Americans live in homes without such devices but routinely welcome guests to their front door. <u>See, e.g.</u>, <u>United States v. Jackson</u>, ___ F. App'x ___, 2015 WL 3938341, at *5 (11th Cir. June 29, 2015)

23

(lack of door knocker did not revoke implied invitation to enter property), cert. denied, ___ S. Ct. __, 2015 WL 5477814 (Oct. 19, 2015). Holmes' burglar-bar door indicates a desire not to be robbed, not a desire to prohibit visitors. His screen and lattice front porch does not deter entry (see supra, p.**13**) and his boarded up garage does not affect the analysis. A dog in the yard and a "BEWARE OF DOG" sign on the driveway gate warns potential visitors that they should look out for the dog when they enter the gate, not that they should avoid entry altogether.[19] Finally, the "PRIVATE PROPERTY[:] NO TRESPASSING" and "BEWARE OF DOG" signs on the sliding construction gate merely duplicate the signs near the driveway gate – if the latter are insufficient to withdraw the implied consent, the former are too.

Holmes' argument therefore relies upon the four-foot chain-link fence surrounding his property, albeit with a partially open gate, and the "NO TRESPASSING" sign to the right of that open gate. Some courts have upheld the constitutionality of knock and talks at fenced properties with open gates bearing "No Trespassing" signs. In United States v. Denim, No. 2:13-CR-63, 2013 WL 4591469 (E.D. Tenn. Aug. 28, 2013), police officers entered through an open driveway gate despite six "No Trespassing" signs posted along the length of the driveway. Denim, 2013 WL 4591469, at *2. Finding that the signs did not constitute an express revocation of the implied license to approach the front door, the court held the knock

---

[19] Such a sign might be posted out of neighborly concern or could be designed to prevent a tort claim. Cf. Belcher Yacht, Inc. v. Stickney, 450 So. 2d 1111, 1112 (Fla. 1984) (applying Florida law in finding that a "BEWARE OF DOG" sign protects a dog's owner from liability for the dog's attacks).

and talk was constitutional. Id. at *5. Similarly, in United States v. Lowry, No. 1:06CR00038MP-AK, 2007 WL 1655419 (N.D. Fla. June 6, 2007) aff'd, 315 F. App'x 214 (11th Cir. 2008), police officers performed a knock and talk at a property that was fenced, albeit with a few gaps where the fence was knocked down by trees. Lowry, 2007 WL 1655419, at *2. There were "No Trespassing" signs on the fence and a box in front of the gate for deliveries, but the gate was unlocked and open. Id. The court found that a police officer may enter the property in such circumstances, and so the knock and talk was permissible.[20] Id. at *3. See also, United States v. Bearden, 780 F.3d 887, 893-94 (8th Cir. 2015) (finding lawful knock and talk where officers entered property through open driveway gate despite presence of "No Trespassing" signs); State v. Roper, 294 P.3d 517, 518 (Or. Ct. App. 2012) (same).

But three Florida appellate courts have found similar combinations sufficient to prevent a valid knock and talk. In Bainter v. State, 135 So. 3d 517 (Fla. 5th DCA 2014), the defendant's home was surrounded by a barbed wire fence with a six-foot chain-link gate blocking the entrance to the driveway. Bainter, 135 So. 3d at 519. Several "No Trespassing" signs were posted on a pole next to the place where the driveway gate shut. Id. Even though service providers would occasionally come onto

---

[20] United States v. Moffitt, 233 F. App'x 409 (5th Cir. 2007) also addresses the applicability of the Fourth Amendment to a case involving a fenced property with "No Trespassing" signs. Moffitt, 233 F. App'x at 412. However, in that case there was no knock and talk, as a confidential informant purchased drugs in the defendant's front yard. Id. at 411. Moffitt is also unhelpful because the court based its decision on a finding that the defendant's driveway and front yard were not within the curtilage, id. at 412, while here the parties agree that the detectives invaded the defendant's curtilage.

the property and the gate was open when police officers arrived, the court found the fence and signs were sufficient to indicate a subjective expectation of privacy that society is prepared to accept as reasonable. Id. at 520. Similarly, in Brown v. State, 152 So. 3d 619 (Fla. 3d DCA 2014), the court found that no person would reasonably go through both a gated four-foot fence and a gated six-foot fence, even when the outer gate was slightly ajar, where the outer fence had three "No Trespassing" signs and neither the home nor its curtilage were visible until the police opened the gates to pass through them. Brown, 152 So. 3d at 624. Additionally, when police encountered the defendant, he "immediately told the police to get off of his property." Id. at 622. Accordingly, a knock and talk at the residence violated the home owner's constitutional rights. Id. at 624. Finally, in Robinson v. State, 164 So. 3d 742 (Fla. 2d DCA 2015), the court found that a knock and talk violated the defendant's Fourth Amendment rights where it was conducted at a property surrounded by a chain-link fence with a closed, but unlocked, gate bearing "No Trespassing" and "Beware of Dog" signs. Robinson, 164 So. 3d at 742-44.

These latter cases call into question the suggestion that a "No Trespassing" sign is irrelevant for purposes of revoking the implied license to enter. Moreover, the Eleventh Circuit has remarked on the absence of "No Trespassing" signs when tallying up the insufficiency of measures taken to revoke the implied license. Jackson, 2015 WL 3938341, at *4 (affirming rejection of challenge to knock and talk where district court found "Beware of Dog" sign did not serve as a signal that visitors were unwelcome as might a "No Trespassing" or "Do Not Enter" sign). Other courts have

too. See, e.g., United States v. Byle, No. 8:10-cr-419-T-30TGW, 2011 WL 1983359, at *10-13 (M.D. Fla. Apr. 15, 2011) (reasoning that owner's intent to exclude visitors was not apparent because gate was not locked and no "No Trespassing" signs were posted); United States v. Clay, No. 4:10-cr-31, 2011 WL 2224606, at *5 (E.D. Tenn. Apr. 11, 2011) (noting absence of any "No Trespassing" signs); Nieminski, 60 So. 3d at 526 (same); United States v. Lubrin, No. CR 2014-0056, 2015 WL 361796, at *2, *6 n.7 (D. V.I. Jan. 28, 2015) (commenting on presence of partial "No Trespassing" sign on property near public road but absence of any sign near unlocked but closed entry gate); see also Edens, 112 F. App'x at 875 (holding homeowner manifests intent to revoke implied license by having a fence, a locked gate, and a "No Trespassing" sign). Presumably, therefore (and contrary to the government's contention), having a "No Trespassing" sign can be an indication (but not the sole determinant) of a property owner's desire to revoke the implied license.

Thus, based on this survey of the cases, it appears that while a "No Trespassing" sign is generally not understood as revoking the implied license by itself, in some circumstances it may help signify a homeowner's desire to keep out all visitors. To have that effect, however, the "No Trespassing" sign must be accompanied by other measures to prevent entry, and its location must be near enough to the point of entry that the sign's meaning is unambiguous. Otherwise, it will not serve as a clear expression revoking the implicit license to walk directly to a home's front door and knock. See supra, pp. 22-23. See also State v. Hiebert, 329 P.3d 1085, 1090-91 (Idaho Ct. App. 2014) (finding "sign's placement [on shed] created an ambiguous message, as

a reasonable visitor . . . would be uncertain of whether the sign prohibited trespassing into the [shed], the . . . driveway to the left of the sign, or the back of the property").

But reviewing the knock and talk cases is unsatisfying because they generally employ a post-hoc case-by-case "totality of the circumstances" analysis which does not provide needed guidance to law enforcement or homeowners. In the cases cited above and others,[21] dozens of factors are considered relevant in determining whether the implied license has been revoked, including: whether the property is rural or urban; the size of the property; whether there is a guard dog, or a security guard or a security camera; whether the mail is delivered to a box on the street or at the house; whether the trash is collected on the property or at the curb; whether the meter is read remotely or at the house; whether members of a local church choose to visit; whether the house is visible from the street; whether there is a walkway or path to the door and if so, whether it is paved; whether there is a door knocker or doorbell; whether there is a fence surrounding the property, whether it is in good repair, the number of fences, whether there are gaps in the fence, the height of the fence, whether the fence is chain-link, or barbed wire, or a picket fence, or a stockade fence; whether there is a gate, whether the gate is open, or closed, or ajar, or locked; whether there is a sign, whether neighbors are aware of the sign, whether law enforcement officers saw the sign, whether it was defendant who posted the sign, the age of the sign, the number of signs, the location of the signs, the size of the signs, the size of the lettering on the signs, the

---

[21] While this opinion cites a number of "knock and talk" and "No Trespassing" sign cases, there are many others. See, e.g., Christensen, 2015 WL 2330185, at *7-8 (collecting cases); Report and Recommendation (Doc. 43) at 17-20 (same).

message on the signs, be it "No Trespassing" or "Do Not Enter" or "Beware of Dog" or "Private Property" or "Keep Out."

Looking in hindsight, any of these factors may seem relevant in a particular case. But the problem with a case-by-case approach is that the property owner and the police should know beforehand what measures are sufficient to revoke the implied license to enter property. Just as the Supreme Court warned in rejecting a case-by-case analysis to determine whether landowners have a legitimate expectation of privacy with regard to open fields, a totality of the circumstances approach to whether the property owner has revoked the implied license to enter is also problematic because "police officers would have to guess before every search whether landowners had erected fences sufficiently high [or] posted a sufficient number of warning signs . . . to establish a right of privacy." Oliver, 466 U.S. at 181. An "ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority, it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced." Id. at 181-82 (internal citation omitted).[22]

---

[22] A further danger with this approach is the potential for inequity caused by the ease with which wealthier citizens can revoke the implied license to approach their "castles." High walls, security cameras, gated driveways, secluded homes, and guard dogs are generally within the domain of the rich, not the poor or middle class, but all citizens should be equally protected from government intrusion. See Christensen, 2015 WL 2330185, at *13 (Williams, J., concurring and dissenting) (expressing concern that requiring multiple expensive indicia to demonstrate a legitimate expectation of privacy strips the rights of those who cannot afford those measures); United States v. Redmon, 138 F.3d 1109, 1132 (7th Cir. 1998) (en banc) (Posner, C.J., dissenting) (commenting that people who have wealth have more physical privacy than others and will therefore derive more protection from the Fourth Amendment).

This is all the more critical when the property involved is a home because "when it comes to the Fourth Amendment, the home is first among equals." Jardines, 133 S. Ct. at 1414. The interests protected by the Fourth Amendment should not merely be subject to retrospective analysis which seeks "to assess privacy expectations by trying to weigh the innumerable ways in which property owners try to express ownership or privacy interests." Report and Recommendation (Doc. 43) at 21 (citing Oliver, 466 U.S. at 181). Rather, homeowners deserve to know beforehand whether the measures they have taken expressly revoke the implied license to enter their property; likewise, the police need to know before they enter whether they will be violating the Constitution if they do so.[23]

---

[23]Although the Supreme Court says the authority of law enforcement officers to approach a residence is coextensive with the authority of any private citizen to do the same, there is also rationale suggesting that law enforcement officers might have broader authority, at least when investigating crimes. For example, in rejecting the defendant's contention that his "No Trespassing" sign should keep all visitors off his property, the district court in Denim explained that "[a]s sacred as the home is . . . society is not willing to accept as reasonable an expectation that a police officer may not come within the curtilage to question a resident of a dwelling to ascertain if that resident has information regarding the commission of a criminal offense." 2013 WL 4591469, at *4. The court explored the point further stating, "[a]s an example, it is impossible for this court to believe that society is prepared to accept as reasonable a right of privacy that would deny a law enforcement officer the right to enter upon property to investigate an anonymous complaint that a child was being abused on that property." Id. at *5. Acknowledging that the law would likely find such a scenario to be warranted as an exigent circumstance, the court questioned whether it was merely a matter of degree, with some crimes creating a sufficient exigency but others not. Id. Rejecting that notion, the court continued: "A crime is a crime, and the police are allowed to enter upon property to conduct a knock and talk. If the resident is unwilling to talk, that ends it, but most citizens assuredly would be willing to talk to a police officer, and this is why society is not prepared to go as far as defendant asks in this case" by suggesting that a "No Trespassing" sign is an explicit revocation of the implied license. Id. In Taylor, where the Eleventh Circuit found police acted in accordance with knock and talk rules when they arrived at a home after midnight to check on the

So, back to Holmes. Did he do enough to revoke the implied license to approach his front door? As noted above, there are a few bright line rules. First, a locked gate with a fence surrounding the property revokes the implied license. See, e.g., Quintana, 594 F. Supp. 2d at 1301; Victores, 2011 WL 3439967, at *5; Hambleton, 2009 WL 722284, at *1-2. Holmes had a fence but did not have a locked gate. Telling visitors to go away would revoke the implied license. Holmes did not do that either. Neither did he employ someone to shoo visitors away or display a sign that would unequivocally revoke the license (not that the Court can say for sure what such a sign might say).[24] He did, however, post a "No Trespassing" sign on the fence surrounding his yard.

The large number of knock and talk cases referencing "No Trespassing" signs suggests that their presence or absence is a relevant consideration. The prevailing view is that when a gate is closed (but not locked), the lack of a "No Trespassing" sign renders the closed gate ineffective to revoke the implied license, because the closed

_____

residents following three 911 hang up calls, the Court stated that it "would consider the police derelict in their duty if they did anything less[ ]" than respond in person to check on the residents. 458 F.3d at 1204. Although the Court made an alternative finding that exigent circumstances would justify the officers' entry, id. at 1205, n.1, (a concept explored in Denim too), these cases leave open the possibility that a different approach might permit officers to visit a home without running afoul of the Fourth Amendment even under circumstances where an average citizen could not.

[24] The government conceded at oral argument that a sign bearing the message "I hereby revoke the implied license to enter this private property" accompanied by the signature of the homeowner would be effective to revoke the implied license. Doc. 73 at 84. However, this might strike many as overly formalistic or unlikely. The Court has not found any written message that courts uniformly deem sufficient in and of itself to convey that the implied license is revoked.

gate could merely be intended to keep children or pets inside.[25] And, where a gate is open, the presence of a "No Trespassing" sign is likewise generally ineffective to revoke the implied license because the open gate undermines the inference that the sign is meant to keep out all visitors instead of just those who might trespass in the traditional sense.[26] In both of those circumstances, the homeowner's message to outsiders is ambiguous and therefore fails to provide the "express" revocation of the implied license. However, it may be inferred from these cases that the <u>combination</u> of posting a "No Trespassing" sign along with the physical act of closing the gate <u>does</u> serve to seal the property and manifest the resident's intent to revoke the implied license to enter. To gain entry, a "reasonably respectful citizen" (or police officer) would have to both disregard the sign <u>and</u> physically open the gate. Thus, a further bright line or categorical rule could perhaps be fashioned: a "No Trespassing" sign placed on or very near a <u>closed</u> gate[27] on a homeowner's fenced property would revoke the

---

[25] See, e.g., Byle, 2011 WL 1983359, at *11.

[26] See, e.g., Lowry, 2007 WL 1655419, at *2-3; Denim, 2013 WL 4591469, at *2-6. Bainter, 135 So. 3d 517, is an exception to this general rule but is likely explained by the barbed wire fence surrounding the property and the separate six foot high gate that blocked the driveway entrance. Bainter, 135 So. 3d at 518. Although the gate was open, "No Trespassing" signs were posted at its entrance. Id. at 518-19. This combination of facts distinguishes Bainter from most of the other authorities.

[27] The gate need not be locked. A locked gate connected to a fence that surrounds the property is itself enough to revoke the implied license. While a cautious homeowner desiring to keep out all visitors might be wise to add a "No Trespassing" sign, if the gate stays locked, the implied license is revoked—officers may not scale a fence or break a lock to access the property. Quintana, 549 F. Supp. 2d at 1301; Victores, 2011 WL 3439967, at *5; Hambleton, 2009 WL 722284, at *1-2. But see, Edens, 112 F. App'x at 875 (homeowner manifests intent to keep out visitors by enclosing property with fence, locking gate <u>and</u> posting "No Trespassing" signs).

implied license to enter.[28]

The Magistrate Judge found Holmes' closest "No Trespassing" sign was four feet to the left of the main driveway gate. Doc. 43 at 4. Based on the photographs, the Court finds that this "No Trespassing" sign is near enough to the gate to be reasonably seen as applying to the gate entry.[29] The Magistrate Judge also found that the officers saw the sign. Doc. 43 at 7. However, because Holmes left the gate partially open, his "No Trespassing" sign is not enough to "expressly" and unambiguously revoke the implied license. "Reasonably respectful citizens" could avail themselves of the implied license to walk through Holmes' open driveway gate, onto his front porch and to his front door, whereupon they could knock and speak with him if he answered.[30] The

---

[28] The circumstances of <u>Robinson</u>, 164 So. 3d 742 (chain-link fence, closed gate with "No Trespassing" sign) and its outcome (knock and talk unlawful) follow this rule. It appears the <u>Brown</u> case does too, assuming the gate on the inner fence was closed—by remarking that the outer gate was "slightly ajar" and stating that officers could not see the property until they "opened the gates," it seems likely the inner gate was closed, although the opinion does not say. 152 So. 3d at 622, 624.

[29] To avoid calculating whether a "No Trespassing" sign's position on a fence is near enough to the gate, an even "brighter"-line rule would require that a "No Trespassing" sign be posted on the closed gate itself.

[30] The Supreme Court and earlier decisions note that the terms of the customary license to approach a home are simple, easily managed by Girl Scouts and trick-or-treaters. <u>See</u> <u>Jardines</u>, 133 S.Ct. at 1416 (Girl Scouts and trick-or-treaters); <u>United States v. Wells</u>, 648 F.3d 671, 679 (8th Cir. 2011) (Girl Scouts); <u>United States v. Moffitt</u>, 233 F. App'x 409, 411-12 (5th Cir. 2007) (trick-or-treaters); <u>State v. Cardell</u>, 41 P.3d 1111, 1114 (Or. Ct. App. 2002) (Girl Scouts). When determining whether that simply understood implied license has been revoked, however, other visitors may be better comparators. In truth, most children old enough to read would be dissuaded from entering any property posted with a "Beware of Dog" sign, or by any similar measure which even potentially suggests visitors are unwelcome. Many of the barriers used by Holmes might well deter Girl Scouts, trick-or-treaters or anyone who has a casual interest in visiting. Likely it is only those who, though not expressly invited, have a reason to visit that particular home—deliverymen, neighbors, mailmen, census takers, pollsters, city inspectors, meter readers and the like—who require "express

33

detectives in this case were free to do as any private citizen might.[31] See King, 131 S. Ct. at 1862. Thus, the knock and talk here did not violate Holmes' Fourth Amendment rights.[32]

---

orders" revoking the implied license before setting aside plans to approach. The perspective of those uninvited visitors is perhaps more useful to consider when assessing whether the implied license has been revoked and, therefore, whether law enforcement officers acted reasonably. See Walker, 2015 WL 5157456, at *3 (considering whether officers' conduct during a knock and talk "was reasonable").

[31] And indeed, on December 3, the detectives had observed a private citizen— their confidential informant—walk through Holmes' open gate and onto the porch to speak with a man answering Holmes' front door without being rebuked for entering without license. (Doc. 37 at 17, 86).

[32] Holmes alternatively argues that the detectives' "entry onto the property was a pretext for searching the curtilage of [his] home." (Doc. 46 at 10). The government points out that the detectives' subjective intent is irrelevant. (Doc. 62 at 19-20); see Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011). In any event, the Court finds that the detectives intended to approach Holmes' door to speak with him (as they attempted to do without success on December 19), and that the "knock and talk" was not a pretext for searching the curtilage. And, contrary to Holmes' suggestion, (Doc. 85 at Tr. 78-79), that the detectives asked Holmes for identification did not change the nature of the interaction. An occupant who chooses to open the door and speak with officers "may refuse to answer any questions at any time." King, 131 S. Ct. at 1862. And, so long as police do not convey the message that compliance is required, officers may ask questions of an individual, including asking for identification. Florida v. Bostick, 501 U.S. 429, 435 (1991). "As with other consensual encounters, officers conducting a 'knock and talk' may generally . . . ask to examine the individual's identification . . . as long as the police do not convey a message that compliance . . . is required." Mitchell v. Shearrer, No. 4:10-cv-819(CEJ), 2012 WL 943322, at *3 (E.D. Mo. Mar. 20, 2012) (internal citations and quotations omitted). See also United States v. Manning, No. 3:07-cr-157, 2008 WL 2401194, at *6 (E.D. Tenn. June 11, 2008) (finding officers did not violate Fourth Amendment by asking for identification as part of knock and talk) (citing Bostick, 501 U.S. at 435). Cf. Moore v. Pederson, __ F.3d __, 2015 WL 5973304, at *6 (11th Cir. Oct. 15, 2015) (holding resident's refusal to respond to officer's requests for identification did not serve as a basis to arrest him). Finally, Detective Thompkins' step toward the front door in response to a suspicious sound inside did not transform his lawful "knock and talk" into an illegal one. See Report and Recommendation (Doc. 43) at 25-27.

The Court, finding no Fourth Amendment violation, declines the government's request to decide whether the evidence would be suppressed if there had been a violation.

## III.   CONCLUSION

That law enforcement generally has an implied license to conduct a "knock and talk" at a homeowner's door is settled. However, the circumstances under which a homeowner has expressly revoked this implied license, including what role the posting of a "No Trespassing" sign plays, is the subject of much litigation and remains unsettled. Fashioning guidance to both homeowners and police through a post-hoc case-by-case approach is problematic. Nevertheless, any effort to divine more predictable rules is also subject to critique. Maybe, for example, the posting of a "No Trespassing" sign has no effect. If not, what signage (with or without a fence) might? What combination of signage and physical barrier is required? Do we want to make it easy or difficult for a homeowner to revoke the implied license? These issues will no doubt continue to be addressed by the appellate courts and likely one day the Supreme Court.

In the meantime, this Court determines that whether it be under this Court's proposed bright line rule or under a more traditional case-by-case "totality of the circumstances" analysis,[33] law enforcement officers did not violate Holmes' Fourth Amendment rights when they conducted a "knock and talk" at his front door.

---

[33] See Report and Recommendation (Doc. 43) at 23-25.

Accordingly, it is hereby

**ORDERED**:

1.      Defendant's Motions to Supplement Authority (Docs. 48, 52, 67) are **GRANTED** to the extent that the Court has considered <u>Brown v. State</u>, 152 So. 3d 619 (Fla. 3d DCA 2014), and <u>Robinson v. State</u>, 164 So. 3d 742 (Fla. 2d DCA 2015).

2.      The undersigned has performed a <u>de</u> <u>novo</u> review and analysis but has borrowed from the Magistrate Judge's Report and Recommendation (Doc. 43). The undersigned adopts the Magistrate Judge's factual findings and credibility determinations as stated herein.

3.      Defendant's Motion to Suppress (Doc. 24) is **DENIED**.[34]

**DONE AND ORDERED** in Jacksonville, Florida this 11th day of November, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

---

[34] Holmes also moved to suppress a pre-<u>Miranda</u> statement that he had "a mini-14 in the safe." (Doc. 24-1 at 7; Doc. 63 at 3 n.1). The United States is not seeking to introduce that statement at trial. (Doc. 26 at 4 n.1). The Court need not determine its admissibility.

w/s.
Copies:

Michael Coolican, AUSA
Cherie L. Krigsman, AUSA
Janet Ellen Johnson, Esquire
Jesse Nolan Dreicer, Esquire
Rosemary Cakmis, Esquire
Defendant

Honorable Patricia D. Barksdale
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case No. 3:14-cr-21-J-32PDB

MICHAEL HOLMES

_____

# EXHIBIT A





UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                          Case No. 3:14-cr-21-J-32PDB

MICHAEL HOLMES

_____

# EXHIBIT B

